UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION
CIVIL ACTION NO. 4:22-CV-P117-JHM

LAMONE LAUDERDALE                                                    PLAINTIFF

v.

AMY BRADY, et al.                                                    DEFENDANTS

<u>**MEMORANDUM OPINION AND ORDER**</u>

This matter is before the Court on the motion for summary judgment filed by Defendants Neil Troost, Amanda Lamar, Jeffrey Harris, Mitzi Weber, and Quality Correctional Care (QCC) (collectively, Defendants).  (DN 170).  Plaintiff Lamone Lauderdale filed a response to the motion (DN 183), to which Defendants replied (DN 185).  Plaintiff also filed a sur-reply (DN 187), which has been considered by the Court.  For the following reasons, the motion for summary judgment will be granted.

I.      BACKGROUND AND PROCEDURAL HISTORY

This is a *pro se* 42 U.S.C. § 1983 prisoner civil-rights action brought by a pretrial detainee previously incarcerated at the Henderson County Detention Center (HCDC).  Plaintiff's complaint alleges that he had a pinched nerve in his left leg, broken vertebrae, and a mental health diagnosis for which he received inadequate medical treatment by Defendants, who provide medical services at HCDC.  (DN 1).  Upon initial review, the Court permitted Plaintiff's medical care claims to proceed under the Fourteenth Amendment against the Defendants in their individual and official capacities and under state law as to QCC.  (DN 6).[1]

---

[1] Following the initial stages of discovery, Plaintiff was granted leave to proceed with an amended complaint, adding Harris and Lamar as Defendants.  (DNs 57, 78).

Plaintiff alleges that, at the time of his complaint, he was housed at HCDC as a pretrial detainee from May 10, 2022, and has "documented health issues of a pinched nerve in his left leg, broken vertebrae in his neck, and mental health concerns." (DN 1, PageID.4).

Plaintiff alleges that he saw Defendant Troost, a physician, on two occasions at HCDC. He claims that Troost deprived him of adequate medical care by prescribing ineffective medication, failing to perform diagnostic tests, delaying examinations, and denying medical treatment upon learning of Plaintiff's lawsuit against him. (DN 1, PageID.4; DN 78, PageID.540, 550, 552). Plaintiff also claims that Troost forced him to take seizure medication against his will. (DN 78, PageID.551-52).

Plaintiff alleges that Defendant Lamar, a nurse, was aware of his medical conditions yet failed to provide "due care." (*Id.*). Specifically, he claims that Lamar saw Plaintiff for an eye injury on November 15, 2022, and Lamar "turned and walked out without acknowledging the Plaintiff or his injuries." (*Id.*, PageID.542-44).

Plaintiff alleges that Defendant Harris, a mental health provider, failed to provide adequate treatment because Harris "allow[ed] Dr. Troost to make mental health treatment decisions, in which Dr. Troost is not qualified to provide mental health treatment." (DN 78, PageID.552). Plaintiff alleges that Troost and Harris treated him "with remedies [they] knew wouldn't work," and forced him to take medication without his consent. (*Id.*).

Plaintiff alleges that Defendants improperly placed him on suicide watch. (*Id.*, PageID.542).

Plaintiff claims that he was incorrectly billed for his seizure medication pursuant to the Inmate Handbook. (*Id.*, PageID.536). In this regard, he alleges that Defendant Weber, a medical

administrator, ignored his billing disputes and failed to investigate erroneous charges to his inmate account.  (DN 1, PageID.4; DN 78, PageID.536).

Plaintiff alleges that QCC has "policies and procedures to put cost over care."  (DN 1, PageID.4).  He concludes that QCC's policies and procedures and the other Defendants' lack of adequate medical care and proper treatment at HCDC constitute deliberate indifference, medical malpractice, and negligence.  (*Id.*, PageID.4-6).

## II.     MOTION FOR SUMMARY JUDGMENT

### A.

Defendants seek summary judgment on Plaintiff's claims on the grounds that: (1) Plaintiff fails to present sufficient evidence to withstand summary judgment on his Fourteenth Amendment deliberate indifference claims against Troost, Lamar, and Harris; (2) his allegations of inadequate medical treatment against Weber fail to state a constitutional claim insofar as Weber is not a medical practitioner; and (3) Plaintiff fails to present evidence to establish viable claims of negligence under state law and municipal liability pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) against QCC.  (DN 171, PageID.1582-1592).

In support of their motion for summary judgment, Defendants submit the sworn affidavits of Troost, Lamar, Harris, and Weber; transcript of Plaintiff's deposition; and Plaintiff's medical records from HCDC.  (DN 68-2 through 68-5; DN 171-2 through 171-4).

### B.

Plaintiff has filed a "Brief in Opposition" to the Defendants' motion for summary judgment.  (DN 183).  In support thereof, Plaintiff submits a sworn declaration; "Agreement for Healthcare Services" between HCDC and QCC; Henderson County Resolution Number 21-15

(Authorizing Henderson County Jailer to Execute Agreement with Quality Correctional Care of Kentucky, LLC, for Jail Healthcare Services), and 501 Kentucky Administrative Regulations 3:090 (Medical Services Generally).  (DN 183-1 through DN 183-3).  Plaintiff incorporates by reference the following items: grievances filed by Plaintiff at HCDC; HCDC's copayment policy; Plaintiff's prescription orders; poem dated July 1, 2022; radiology report dated July 7, 2022; and an incident report dated June 30, 2022.  (DN 97-2).

### C.

In their reply, Defendants assert that Plaintiff fails to present expert testimony as required for his state law negligence claim against QCC; his Fourteenth Amendment claim against Weber for deliberate indifference to serious medical needs fails because Weber is not a medical professional and did not provide medical treatment; he does not articulate a basis for a *Monell* claim against QCC; and his Fourteenth Amendment deliberate indifference claims against Troost, Lamar, and Harris fail on the merits because he has not submitted evidence sufficient to create a genuine dispute for trial.  (DN 185, PageID.1859-1867).

### D.

The following facts are undisputed unless otherwise noted.  Plaintiff was a federal pretrial detainee housed at the Henderson County Jail from May 2022, to December 2022, during which time the complained-of events took place.  (DN 68-5, PageID.377).

A medical intake form from HCDC shows Plaintiff's history of epilepsy, a pinched nerve, C-4/C-5 fracture, and anxiety/depression.  (DN 171-2, PageID.1596).  Plaintiff asserts that he reported a history of schizophrenia upon intake as well.  (DN 183, Page.ID.1799).

Defendant Troost is a licensed physician who was employed by QCC at the time of Plaintiff's complaint.  (DN 68-3, PageID.367).  The medical records reflect that Troost initially

4

saw Plaintiff on June 1, 2022. (DN 171-2, PageID.1597-98). During that visit, Plaintiff's medical history was reviewed, which included epilepsy and a chronic cervical spine injury for which Plaintiff had undergone physical therapy and medication treatment without surgery. Plaintiff also reported a pinched nerve in the left leg/thigh. Plaintiff's vital signs were normal. A previous MRI confirmed moderate degenerative disc disease and spinal stenosis of the cervical spine. Following Plaintiff's review and assessment, Troost prescribed Tegretol (an anti-epilepsy medication that is also indicated for nerve pain) and Naproxen (anti-inflammatory for pain). (*Id*., PageID.1597-98).

On June 30, 2022, Plaintiff was found by HCDC staff to be hoarding his medications in his cell. (DN 171-2, PageID.1606-12). Plaintiff admits to "double-dosing" because the medications were ineffective in treating his pain, and he did not receive a response from medical about his complaints within two weeks. (DN 68-5, PageID.378, 380; DN 183, Page.ID.1811,1824).

Upon learning that Plaintiff had been hoarding his medication, Troost discontinued Tegretol and Naproxen on June 30, 2022. (DN 68-4, PageID.372). The following day, Plaintiff saw Troost and reported head trauma due to a fight two weeks prior. Troost's assessment revealed no facial swelling but noted Plaintiff's complaints of nasal pain. His vital signs were normal. Troost ordered an x-ray of the face and back. (DN 171-2, PageID.1598-99). According to Troost, he prescribed Keppra at that time to address both Plaintiff's seizure disorder and his complaints of pain. (DN 68-4, PageID.372).

Plaintiff did not take his Keppra as prescribed. (DN 97-2, PageID.994, 997-99; DN 171-2, PageID.1602-05). Plaintiff admits that he refused administration of Keppra due to his belief that it was ineffective and not intended for pain management. (DN 68-5, PageID.386;

DN 183, Page.ID.1813-14).  Troost attests that Plaintiff's failure to take Keppra as prescribed would impact its efficacy for both controlling epileptic seizures and nerve pain.  (DN 68-4, PageID.373).

According to Troost, Plaintiff did not have significant abnormalities or restrictions to daily activities.  Plaintiff reported discomfort and pain, however, Troost did not believe emergency treatment or surgery was warranted for Plaintiff's conditions.  (DN 68-4, PageID.373).  A private medical record reviewed by Troost indicated that Plaintiff had declined surgical intervention for his cervical spine, and instead opted for conservative measures such as exercises and medication.  (*Id.*).  Plaintiff disputes the characterization that he "denied surgery" for his back prior to his detention, but rather he "opted for therapy as an alternative prior to surgery." (DN 183, Page.ID.1799).

Defendant Lamar was employed by QCC as a registered nurse at HCDC at the time of Plaintiff's complaint.  (DN 171-4, PageID.1627).  On November 14, 2022, Lamar attempted to speak with Plaintiff regarding his medication, as he had refused to take Keppra for the previous four days.  (*Id.*).  Plaintiff refused to engage with Lamar and walked away from his cell door. (DN 171-2, PageID.1614).  After Lamar was not able to obtain any information, she notified Troost, who placed Plaintiff on suicide watch for monitoring, and to assess for potentially self-injurious behavior in light of his medication refusals. (DN 171-4, PageID.1628).  A different nurse attended to Plaintiff on November 16, 2022.  (*Id.*, PageID.1629).  On that date, Plaintiff complained of bilateral knee and throat pain but had normal range of motion on examination and had no redness or swelling.  (DN 171-2, PageID.1619).  Plaintiff complained to the nurse about medical charges and stated that he should not have to pay for "meds or visits." (*Id.*).  Motrin and Claritin were ordered for Plaintiff.  (*Id.*).  Plaintiff disputes this version of events, asserting that

Lamar "walked out" on Plaintiff instead of treating his injuries on November 14 and November 15, 2022. (DN 183, PageID.1825).

Defendant Harris is a private psychotherapist who provided services to HCDC. As such, he treated Plaintiff with respect to his mental health conditions. (DN 171-3, PageID.1623). According to Harris, Plaintiff "has a history of non-specific depression and anxiety, which will primarily manifest itself in behavioral outbursts, both verbal and physical. He also has a history of medical non-compliance, especially with his prescribed medications." (*Id*.).

Harris met with Plaintiff on June 30, 2022. Plaintiff reported and exhibited symptoms of increased depression. He explained to Harris his reasons for "cheeking" medications. (DN 171-2, PageID.1600).

Harris met with Plaintiff again on July 15, 2022. Plaintiff reported difficulty sleeping and exhibited a heightened sense of awareness. Harris encouraged Plaintiff to comply with physician orders and to utilize coping skills daily. Harris provided Plaintiff with "CP and puzzles for emotional support." (*Id*.).

On August 8, 2022, Harris met with Plaintiff via telehealth, during which Plaintiff reported frustration that his mental health medications had been stopped. They discussed positive coping strategies, noting impact of distracting techniques. Plaintiff was notified of the medication discontinuation orders due to non-compliance. "When encouraged to put in a sick call to ask the doctor to reconsider, [Plaintiff] stated, 'I ain't got time for y'all, y'all don't care about nothing,'" and terminated the call. (DN 171-2, PageID.1601).

On November 14, 2022, Harris met with Plaintiff upon learning that Plaintiff had refused Keppra for the previous four days. Plaintiff "had little verbal expression," and was "reluctant to openly discuss any mental health concerns." (DN 171-2, PageID.1613). He was encouraged to

take his medication and was referred to the nurse to discuss the same. Plaintiff was provided worksheets for improving his coping skills and was referred to nursing for discussion regarding medication. (*Id.*). Harris was then notified that Troost had ordered Plaintiff to be placed on suicide watch due to his ongoing medication noncompliance. (DN 171-3, PageID.1624). Plaintiff disputes the justification for his placement on suicide watch, which he states, "had nothing to do with mental health or suicidal concerns." (DN 183, PageID.1826).

Between November 14, 2022, and November 21, 2022, while Plaintiff was on suicide watch, Harris met with Plaintiff on multiple occasions, encouraging Plaintiff to speak with medical staff regarding his medication and medication compliance. (DN 171-2, PageID.1616-22).

On November 15, 2022, Plaintiff was witnessed being disrespectful to nursing staff and a deputy during a cell visit. He appeared "angry, lashing out and blaming others, was verbally aggressive." (DN 171-2, PageID.1617). Counseling was deferred until Plaintiff calmed down. (*Id.*). On the same date, Harris spoke with Plaintiff in his cell. Plaintiff "seemed focused only on the [behavior] of others. He further stated, 'I heard y'all talking about trying to harm me.'" (*Id.*, PageID.1618).

On November 16, 2022, Plaintiff told Harris that he should not be on suicide watch. Harris provided him with information regarding protocol, encouraging him to comply. (*Id.*). On November 17, 2022, Harris met with Plaintiff who told him, "it's my right to take medications as I want." (*Id.*, PageID.1620). Harris noted "evidence of defiant attitude . . . one wonders if depressed mood or increasing anxiety might contribute to poor outlook. Consult with physician." (*Id.*). On November 21, 2022, Harris noted that Plaintiff presented as irritated and anxious, denied suicidal ideation, and reported that he had been taking his medication. He

seemed engaging and did not appear to possess characteristics of impulsiveness.  (*Id.*, PageID.1621).  Plaintiff was removed from suicide watch upon agreeing to take his medication on November 21, 2022.  (*Id.*, PageID.1622).

Following Plaintiff's release from suicide watch, Harris met with Plaintiff to discuss self-care habits and routine.  Plaintiff was encouraged to submit a sick call slip if he needed to speak with medical or mental health providers.  (*Id.*).  According to Harris, the purpose of the interactions with Plaintiff was "not to force Plaintiff's compliance with a medication, or to punish him, but to continually assess him, to determine if his medication refusals were based upon a mental health issue that could be addressed through my services."  (DN 171-3, PageID.1625-26).  Harris also "wanted to provide sufficient information for Dr. Troost and custody staff to make decisions regarding housing and placement on suicide watch."  (*Id.*, PageID.1626).  Per Harris, the "goal with these visits with [Plaintiff] was to reinforce positive behavior and expressions while discussing strategies and techniques to better cope with his circumstances, and his interactions with others."  (*Id.*).

Defendant Weber was employed by QCC at HCDC in an administrative capacity.  She is not a nurse or doctor, nor does she provide direct patient care.  Weber assists medical staff with paperwork such as responding to offender requests regarding their trust fund balance, billing, and copayments.  (DN 68-3, PageID.367).

On July 17, 2022, Plaintiff filed a grievance regarding a $30.00 deduction from his account.  Weber responded, indicating that Plaintiff's account was billed $30.00 for a doctor visit and monthly medication in June 2022.  (DN 97-2, PageID.931).

On October 19, 2022, Plaintiff filed a grievance stating that he should not have been charged for a doctor visit and medication because they are considered preventative under HCDC

policy.  (*Id.*, PageID.938).  The HCDC "Notification of Federal Prisoner Healthcare Copayment Act of 2000,"[2] reads, in pertinent part,

> State or local government may assess and collect a reasonable fee from the trust fund account (or institutional equivalent) of a Federal prisoner for health care services if . . .  the services . . . are not preventative health care services, emergency services, prenatal care, diagnosis or treatment of chronic infectious diseases, mental health care, or substance abuse treatment.

(*Id.*, PageID.946).  It further prohibits refusal of treatment for financial reasons, such as if the account is insolvent or the prisoner is otherwise unable to pay.  (*Id.*); s*ee also* 18 U.S.C. § 4013.

Weber responded to the grievance, explaining the charges for September and October, advising that copays are set by the jail and for Plaintiff to contact inmate accounts.  (*Id.*).  Plaintiff appealed Weber's response, and on October 20, 2022, HCDC Major McElfresh denied Plaintiff's appeal.  (*Id.*, PageID.940;  DN 68-3, PageID.367).

### III.    LEGAL STANDARD

Before the Court may grant a motion for summary judgment, it must find that there is "no genuine dispute as to any material fact" and that the moving party is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

Assuming the moving party satisfies its burden of production, the nonmovant "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts

---

[2] This document pertains to health care fees for federal prisoners in non-federal institutions.  (*Id.*).

that reveal a genuine issue for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Celotex*, 477 U.S. at 324).  The non-moving party's evidence is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in favor of the party opposing summary judgment.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The fact that a plaintiff is *pro se* does not lessen his or her obligations under Rule 56. "The liberal treatment of pro se pleadings does not require the lenient treatment of substantive law, and the liberal standards that apply at the pleading stage do not apply after a case has progressed to the summary judgment stage."  *Johnson v. Stewart*, No. 08-1521, 2010 WL 8738105, at *3 (6th Cir. May 5, 2010) (citations omitted).  However, statements in a verified complaint that are based on personal knowledge may function as the equivalent of affidavit statements for purposes of summary judgment.  *Weber v. Franks*, 229 F.3d 514, 526 n.13 (6th Cir. 2000); *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992); *see also Carr v. Metro Gov't*, No. 3:19-CV-P449-CHB, 2022 WL 4686993, at *3–4 (W.D. Ky. Sept. 30, 2022).

## IV.  DISCUSSION

### A.

The Due Process Clause of the Fourteenth Amendment "forbids holding pretrial detainees in conditions that 'amount to punishment.'"  *Kingsley v. Hendrickson*, 576 U.S. 389, 405 (2015) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)).  Therefore, when a pretrial detainee asserts a claim related to medical treatment, the claim is analyzed under the Fourteenth Amendment.  *Griffith v. Franklin Cnty.*, 975 F.3d 554, 566-67 (6th Cir. 2020) (citing *Winkler v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018)).  The Fourteenth Amendment deliberate

indifference standard has both an objective and a subjective component.  *Helphenstine v. Lewis*

*Cnty., Kentucky*, 60 F.4th 305, 316-317 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 692 (2024).

    As recently explained by the Sixth Circuit,

> The standard in this circuit to prove a deliberate-indifference claim
> brought under the Fourteenth Amendment by a pretrial detainee is
> clear. To make out such a claim, a plaintiff must demonstrate
> (1) an objectively serious medical need; and (2) that the
> defendants, analyzed individually, acted (or failed to act)
> intentionally and either ignored the serious medical need or
> "recklessly failed to act reasonably to mitigate the risk the serious
> medical need posed."  *Greene v. Crawford Cnty.*, 22 F.4th 593,
> 607 (6th Cir. 2022) (quoting *Brawner v. Scott Cnty.*, 14 F.4th 585,
> 597 (6th Cir. 2021) *cert. denied*, —— U.S. ——, 143 S. Ct. 84, 214
> L.Ed.2d 13 (2022)).  Stated differently, a pretrial detainee must
> have a serious medical need, and the defendant must act, whether
> through intentional action or omission, recklessly in response to
> the need and the risk it presented to the detainee.  *See
> Helphenstine*[,] 60 F.4th at 317.

*Grote v. Kenton Cnty.*, 85 F.4th 397, 405 (6th Cir. 2023); *see also Mercer v. Athens Cnty.*,

72 F.4th 152 (6th Cir. 2023) (discussing departure from analyzing Eighth and Fourteenth

Amendment deliberate indifference claims under the same rubric following *Kingsley* and

*Brawner, supra*).

    Under the post-*Brawner* framework, the first question is whether the plaintiff had a

serious medical need, which has been defined as "'one that has been diagnosed by a physician as

mandating treatment or one that is so obvious that even a lay person would easily recognize the

necessity for a doctor's attention.'"  *Vontz v. Hotaling*, No. 2:19-CV-12735, 2023 WL 2881350,

at  *6  (E.D.  Mich.  Mar.  6,  2023),  *report  and  recommendation  adopted*,

No. 219CV12735TGBKGA, 2023 WL 2873347 (E.D. Mich. Apr. 10, 2023), *appeal dismissed*

(July 11, 2023) (quoting *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004))

(other citations and quotations omitted).

"As to the second prong, it is important to note that *Brawner* did not change the principle that mere medical negligence, nor a disagreement between treater and patient as to the better course of treatment, does not equate to a constitutional violation, either under the Eighth or the Fourteenth Amendment."  *Vontz*, 2023 WL 2881350, at *6 (citing *Brawner*, 14 F.4th at 596 (stating that a plaintiff must show "more than negligence"), and *Westlake v. Lucas*, 537 F.2d 857, 860, n.5 (6th Cir. 1976) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.") (other citations omitted)).

### 1.        Defendant Troost

In his motion for summary judgment, Troost argues that the undisputed record establishes that Troost "did not disregard or ignore an obvious or substantial risk" to Plaintiff.[3]  (DN 171, PageID.1584).  Troost admits, for purposes of this motion only, that there is an issue of fact as to whether Plaintiff's medical condition could amount to a serious medical need under the Fourteenth Amendment.  (*Id.*, PageID.1583-84).

As stated above, to establish deliberate indifference, Plaintiff must show that Troost either deliberately ignored or recklessly failed to act reasonably to mitigate the risk posed by his medical conditions.  *See Brawner*, 14 F.4th at 597.  In this regard, Plaintiff identifies several purported deficiencies concerning the adequacy of his treatment by Troost.

---

[3] In support of their argument in favor of summary judgment, Defendants cite to *Trozzi v. Lake Cnty*, 29 F.4th 745, 757-58 (6th Cir. 2022), in which a panel of the Sixth Circuit set forth a three-part test applicable deliberate indifference claims raised by pretrial detainees.  The Court notes that the Sixth Circuit has since abandoned that approach in favor of the reckless disregard standard articulated in *Brawner* and *Helphenstine*, *supra*.  *See Howell v. NaphCare, Inc*., 67 F.4th 302, 311, n.3 (6th Cir. 2023).  The Court agrees, however, that Plaintiff's claims fail on the merits, for the reasons discussed herein.

Plaintiff first argues that he was not prescribed "any medications or medical treatments to address his leg, neck, nerve damage, schizophrenia,[4] and anxiety," thereby only treating "some," but not all of Plaintiff's serious medical needs. (DN 183, PageID.1806). To that end, Plaintiff produces medical records from QCC at HCDC, which show that Troost prescribed several medications for Plaintiff, including Effexor (depression/anxiety),[5] levetiracetam/Keppra (epilepsy/nerve pain), Tegretol (same), Naproxen (anti-inflammatory/pain), ibuprofen (same), and as well as loratadine and an antibiotic ointment. (DN 97-2, PageID.1000-01). Medical records from HCDC indicate that Troost reviewed Plaintiff's medical history and discussed with Plaintiff his seizure disorder, cervical spine injury, left leg pain/pinched nerve, and head trauma due to an inmate altercation. (DN 171-2, PageID.1597-99). Plaintiff's assertion that he was denied treatment for his documented medical conditions is therefore belied by the record evidence produced by both sides. *See Williams v. Mattson*, 221 F.3d 1337, at *1 (6th Cir. 2000) (affirming a grant of summary judgment despite the plaintiff disputing medical records where "defendants' affidavits and [the plaintiff's] medical records show that he was treated for each of the conditions which he contends were ignored."); *see generally Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Plaintiff next argues that Troost ignored his requests for medical care when the prescribed medications for pain became ineffective. (DN 183, PageID.1799, 1809, 1812). As a result, Plaintiff began "double dosing [his] medication to help the pain," because he did not get a response from medical for "weeks at a time." (DN 68-5, PageID.378). Plaintiff testified,

---

[4] There is no evidence of a diagnosis of schizophrenia in the record. (DNs 68, 87, 183).
[5] Plaintiff's mental health conditions and treatment are discussed in further detail below. *See infra*, IV.A.3.

"[Troost] specifically told me to put something in within two weeks from the time that he prescribed the medication, that he would address it.  It was way beyond two weeks that he never addressed it, which caused me to put a request and grievance in because I wasn't getting my issues addressed, as he said he would.  I never would've had any other expectations if I wasn't told specifically what to expect."  (DN 68-5, PageID.387).

However, medical records submitted by Plaintiff establish that Plaintiff was seen by QCC nursing staff, under the supervision of Troost, on June 9, June 23, and June 24, 2022.  (DN 97-2, PageID.987-93).  Plaintiff notified nursing staff on June 9, 2022, that Naprosyn/Naproxen was not working for his neck and back pain, and that traction therapy had helped in the past. A nursing note states, "keep patient's pain at tolerable level."  (*Id.*, PageID.988-89).  Plaintiff testified that he saw Troost approximately four weeks after their initial encounter.  (DN 68-5, PageID.387).  During that visit, Troost noted Plaintiff's complaints of pain, ordered x-rays, and re-started Plaintiff on Keppra.  He noted, "will discuss with corrections regarding other meds." (DN 171-2, PageID.1598-99).  Significantly, Plaintiff testified that his pain did not become more severe until November 2022, after his encounter with Troost on July 1, 2022.  (DN 68-5, PageID.391).[6]

The record does not evince recklessness on Troost's behalf, but rather demonstrates Plaintiff's dissatisfaction with not being able to see Troost within two weeks for medication reassessment and with not receiving the treatment of his choice.  This, however, does not present a genuine issue of material fact as to whether Troost ignored or overlooked a serious medical need.  *See Taylor v. Well Path Med.*, No. 3:22-CV-00705, 2024 WL 3897449, at *8 (M.D. Tenn. Aug. 20, 2024), *report and recommendation adopted*, No. 3:22-CV-00705, 2024 WL 4457839

---

[6] Plaintiff testified to seeing a different physician at HCDC prior to his transfer to another facility in December 2022.  That physician ordered stretching.  (DN 68-5, PageID.391).  Plaintiff further testified that, at the time of his deposition in April of 2023, he was not receiving pain medication at his current facility.  (*Id.*).

(M.D. Tenn. Oct. 10, 2024) (pretrial detainee's "desire for different, more aggressive, or more prompt treatment is simply not sufficient to support a constitutional claim.").

Relatedly, Plaintiff claims that Troost knowingly prescribed medications that were ineffective. (DN 78, PageID.551-52). Plaintiff cites to *Est. of Majors v. Gerlach*, 821 F. App'x 533, 543 (6th Cir. 2020), for the proposition that a prison physician's disregard of a plaintiff's continued complaints of symptoms supported a finding of deliberate indifference. *Majors* involved a claim against prison medical personnel who failed to treat the plaintiff's multiple sclerosis (MS) despite being informed of the diagnosis. The plaintiff's diagnosis had been confirmed by previous prison authorities and an established plan of treatment was in place. The defendants, however, refused to continue the medication injections that appeared to be effective at slowing the progression of MS. The defendants also did not order a diagnostic test to confirm or monitor the disease's progress. The plaintiff's reports of symptoms were ignored despite a relapse in his MS. Major's diagnosis was not confirmed, and treatment was not resumed until four years later, after his condition significantly deteriorated. 821 F. App'x at 535. The Sixth Circuit found that a reasonable jury could find that the medical providers' course of treatment was "so cursory as to amount to no treatment at all" under the Eighth Amendment. *Id.* at 542 (internal quotation omitted).

Such is not the case here. The record reveals that Troost ordered prescription medications following a review of Plaintiff's medical records and an assessment of his subjective complaints and objective symptoms. (DN 97-2, PageID.983-86; DN 171-2, PageID.1597-98). By the time Plaintiff saw Troost one month later, certain medications had been discontinued due to Plaintiff's hoarding of his pills. (DN 97-2, PageID.997). Considering Plaintiff's non-

compliance, Troost then prescribed an anti-epileptic medication (Keppra)[7] that, in certain dosages, can assist with nerve pain, so that Plaintiff had a medication that could address his medical needs.  (DN 68-4, PageID.372).  This scenario is not analogous to a prison physician who abandons a known, effective course of treatment in pursuit of a an ineffective one, or where an inmate's palpably deteriorating condition is routinely ignored by medical practitioners.  In short, Plaintiff complained that his current medications were ineffective, and two weeks later, Troost prescribed a different medication to address Plaintiff's concerns, despite his non-compliance with medical orders.  This exercise of medical judgment cannot form the basis of a constitutional claim.  *See Hutchins v. Pollack*, No. 1:22-CV-950, 2024 WL 3290840, at *8 (W.D. Mich. Feb. 29, 2024), *report and recommendation adopted*, No. 1:22-CV-950, 2024 WL 2827831 (W.D. Mich. June 4, 2024) (granting summary judgment on Fourteenth Amendment deliberate indifference claim in favor of physician where pretrial detainee refused to take his prescribed seizure medication, preferring a different prescription drug).  Although Plaintiff repeatedly disputes that Keppra can be used to treat chronic pain, *see* DN 183, PageID.1813-14, he offers no medical evidence in support of this argument.  *See Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008) ("Conclusory assertions, supported only by Plaintiffs own opinions, cannot withstand a motion for summary judgment.").  Again, Troost's decision to prescribe a single drug to address multiple symptoms in light of Plaintiff's non-compliance is the type of medical judgment by a physician that the Court does not second guess. *Brown v. Haiderer*, No. 4:21-CV-11565, 2024 WL 3105664, at *10 (E.D. Mich. June 17, 2024), *report and recommendation adopted*, No. 21-CV-11565, 2024 WL 4361580 (E.D. Mich. Sept. 30, 2024) ("It is not inappropriate for medical staff to take a prisoner's past treatment and

---

[7] The record shows that Plaintiff reported Keppra as a previous medication upon intake at HCDC.  (DN 171-2, PageID.1596).

compliance history into account when considering a course of treatment nor does disagreement with an outside doctor as to the course of treatment show deliberate indifference" under the Eighth Amendment); *see also Westlake*, 537 F.2d at 860 n.5.

Plaintiff similarly contends that he was not offered alternative treatments, such as traction therapy, or an off-site referral for his complaints of pain. (DN 183, PageID.1808-21). However, he presents no admissible evidence establishing a medical need for alternative treatment, certain diagnostic imaging, or referral to a specialist. *See Taylor*, 2024 WL 3897449, at *8 (granting summary judgment where pretrial detainee "fail[ed] to support his contention that he should have been provided with different or more prompt treatment with any type of expert medical testimony."). While Plaintiff maintains that Troost's conduct was negligent, *see* DN 183, PageID.1816, it is well-settled that "negligence is insufficient" to raise a constitutional issue. *Brawner*, 14 F.4th at 596; *see also Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997) (finding "[m]isdiagnoses, negligence, and malpractice" are not "tantamount to deliberate indifference").

Plaintiff's medical history was reviewed, and his conditions were assessed. Despite his non-compliance with medication, Troost adjusted Plaintiff's prescriptions according to his medical judgment, and Plaintiff continued to be monitored by medical staff at HCDC prior to his transfer to another facility. While Plaintiff may disagree with the adequacy of the treatment he received, such disagreement does not rise to a constitutional infirmity. *See Taylor*, 2024 WL 3897449, at *8 ("In the end, Plaintiff's claim . . . is based upon Plaintiff's dissatisfaction with the adequacy of the treatment that he received, which is insufficient to support a constitutional claim."); *see also Westlake*, 537 F.2d at 860 n.5 ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal

courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."). Plaintiff, by his own admissions, refused to cooperate in his own medical care and instead alleges deliberate indifference for not receiving the treatment of his choice. Based on this record, Plaintiff has failed to raise a genuine dispute as to whether Troost was deliberately indifferent to his serious medical needs. *Wagle v. Farris*, No. 5:21-CV-12881, 2023 WL 5988615, at *6 (E.D. Mich. July 25, 2023), *report and recommendation adopted*, No. 21-CV-12881, 2023 WL 5985490 (E.D. Mich. Sept. 14, 2023) (granting summary judgment where plaintiff disagreed with physician's course of treatment and claim of deliberate indifference was further undermined by his medication non-compliance).

Plaintiff next argues that Troost "forced" him to take medication against his will and improperly placed him on suicide watch for medication non-compliance. (DN 183, PageID.1826-31). However, there are no facts on this record suggesting that Troost involuntarily administered Plaintiff's seizure medication, as evidenced by Plaintiff's documented refusals and his deposition testimony. (DN 68-5, PageID.382; DN 171-2, PageID.1602-05). Further, Troost's actions in ordering Keppra and attempting to ensure Plaintiff's medication compliance for the purpose of preventing epileptic seizures and mitigating his pain are incompatible with Plaintiff's assertion that Troost recklessly disregarded a serious medical need. *Cf. Davis v. Agosto*, 89 F. App'x 523, 529 (6th Cir. 2004) (suturing a cut on the plaintiff's head without his consent was not "unnecessary and wanton," was necessary to close an open wound that posed a threat to his health and safety, and did not violate the Eighth Amendment); *see also Holley v. Deal*, 948 F. Supp. 711, 718 (M.D. Tenn. 1996) (prison officials did not act in deliberately indifferent manner in administering medication to inmate where, among other things, inmate

received medical treatment and attention, and it appeared that officials were attentive to inmate's medical needs).

Insofar as Plaintiff raises a due process claim implicating his right to refuse medical treatment, it must fail for the same reason. (DN 183, PageID.1826). "While '[t]he Supreme Court has held that individuals in state custody enjoy [a] protectable liberty interest[ ] . . . to refuse medical treatment[,]' *Noble v. Schmitt*, 87 F.3d 157, 161 (6th Cir. 1996), that right is not absolute and is particularly susceptible to regulation in the prison setting." *Davis v. Agosto*, 89 F. App'x 523, 528 (6th Cir. 2004). Plaintiff exercised that right on numerous occasions, by his own admission. (DN 68-5, PageID.382).

Plaintiff cites to *Kramer v. Wilkinson*, 302 F. App'x 396 (6th Cir. 2008), in support of his claim. (DN 183, PageID.1826). *Kramer* involved the involuntary administration of psychotropic medication to a mentally ill inmate. The Sixth Circuit found no due process violation where the medication was necessary to control the plaintiff's illness, and he was afforded a hearing to challenge the administration of the medication. 302 F. App'x at 400. The circuit court further found no Eighth Amendment violation because the plaintiff's disagreement with the prescribing physician's medical judgment was insufficient to rise to such grossly inadequate care as to violate the law. *Id.* at 401.

The facts here do not support the forced or involuntary administration of Plaintiff's anti-seizure medication, so the Court's inquiry ends here. *Heard v. Landfair*, No. 20-11680, 2022 WL 13800829, at *4 (E.D. Mich. Oct. 21, 2022), *aff'd*, No. 23-1277, 2024 WL 1252399 (6th Cir. Jan. 2, 2024) ("incarcerated individuals have a constitutionally protected liberty interest under the Fourteenth Amendment to refuse unwanted medical treatment offered by corrections officials . . . . However, Heard's claim fails on the second element: no one forced him to receive

the tuberculosis shot. Since he was not deprived of his right to refuse medical care, Heard's procedural due process claim fails as a matter of law."); *Carter v. Ayala*, No. 1:13-CV-807, 2017 WL 9480152, at *10 (W.D. Mich. Mar. 8, 2017), *report and recommendation adopted*, No. 1:13-CV-0807, 2017 WL 1173475 (W.D. Mich. Mar. 30, 2017), *aff'd*, No. 17-1506, 2018 WL 2086044 (6th Cir. Jan. 3, 2018) (no constitutional violation because plaintiff was not forced, and in fact refused to attend outpatient mental health treatment).

Likewise, Plaintiff's placement on suicide watch, which he contends was conditioned upon his compliance with his anti-seizure medication, did not put him at a substantial risk of serious harm. To the contrary, Troost's action in this regard was a reasonable measure to monitor Plaintiff in light of his refusal to take medication intended to control epileptic seizures. *See Brown v. Perez*, No. 16-2558, 2017 WL 3378994, at *3 (6th Cir. Apr. 17, 2017) (affirming dismissal for failure to state a claim where plaintiff alleged being placed on suicide watch even though he was not suicidal, instead, defendants "took reasonable measures . . . to relocate Brown to an observation cell for his own protection—i.e., to avoid a substantial risk that Brown would inflict serious harm upon himself.").

Finally, Plaintiff alleges that Troost refused to provide him medical treatment on October 20, 2022, after learning of the lawsuit against him.[8] (DN 78, PageID.540). In support thereof, Plaintiff cites to a medical grievance addressed to Troost on October 20, 2022,[9] in which Plaintiff wrote, "no test or procedure has been provided. My pain and suffering has become a result of your lack of treatment and care. Comments made in regards to any legal litigation is unprofessional and shall not hinder treatment or care warranted." (DN 97-2, PageID.939;

---

[8] Plaintiff did not advance a stand-alone retaliation claim against Troost in his pleadings. (DNs 1, 78). Therefore, the Court construes this argument as an extension of his deliberate indifference claim insofar as he alleges a denial of medical treatment.

[9] The record does not show a medical visit on or around October 20, 2022.

DN 183, PageID.1818).  This exhibit does not establish that Troost refused to provide Plaintiff medical treatment, and, in any event, cannot be considered for the truth of the matter asserted, as "[p]rison grievances are not admissible evidence of underlying facts."  *Bumpus v. Dyersburg, Tennessee, Dyer Cnty. Sheriff's Off.*, No. 118CV01246SHMCGC, 2022 WL 429256, at *7, n.2 (W.D. Tenn. Feb. 11, 2022) (citing *Brown v. Davis*, No. 1:18-CV-1362, 2020 WL 6597344, at *6 n.4 (W.D. Mich. Feb. 12, 2020) (finding that prison grievances constitute hearsay), *report and recommendation adopted*, No. 1:18-CV-1362, 2020 WL 5228987 (W.D. Mich. Sept. 2, 2020); *Sebestyen v. Gardner*, No. 2:17-CV-550, 2021 WL 2562240, at *3 (S.D. Ohio June 23, 2021) ("Plaintiff cites to no evidence to support his version of events. He cites only to his grievances . . . which are hearsay and cannot be considered for the truth of the matter asserted.").

Upon further review of the record, Plaintiff's deposition testimony reveals that, during the visit in question, Troost "went over" Plaintiff's medical records and "confirmed [his] injuries."  (DN 68-5, PageID.390).  Plaintiff acknowledged that Troost had continued to provide medication for his conditions but felt that Troost should have ordered a new MRI at that time. (*Id.*).  On this record, a reasonable juror could conclude that Plaintiff was denied his desired treatment by Troost's failure to order additional diagnostic tests.  But, as stated previously, this alone cannot support a constitutional deliberate indifference claim.  *See Duckett v. Cumberland Cnty. Sheriff Dep't*, No. 2:18-CV-00024, 2022 WL 18462077, at *19 (M.D. Tenn. Aug. 19, 2022), *report and recommendation adopted*, No. 2:18-CV-00024, 2022 WL 4125203 (M.D. Tenn. Sept. 9, 2022) (granting summary judgment on pretrial detainee's deliberate indifference claim where plaintiff argued that defendant-nurse did not provide additional testing). Accordingly, Plaintiff fails to raise a genuine dispute as to whether Troost was deliberately indifferent to his serious medical needs.

For these reasons, the Court finds that Troost is entitled to summary judgment on Plaintiff's Fourteenth Amendment deliberate indifference claims against him.

### 2.

Lamar claims entitlement to judgment as a matter of law because Plaintiff did not have any significant or serious medical injuries that required medical attention at the time of their encounter, and he has not adduced evidence that Lamar acted recklessly in the face of a known risk. (DN 171, PageID.1587-90).

Plaintiff argues that Lamar exhibited deliberate indifference to his serious medical needs when, on November 15, 2022, she saw Plaintiff to evaluate an eye injury. Upon his complaints of other injuries, Lamar "walked out" on him. (DN 183, PageID.1825). Plaintiff produces a grievance dated November 16, 2022, in which he complained that "[m]edical saw me . . . but only was concerned about my eye. She did not look at my back and knees, in which I told her I felt pain at. She walked off and said it was due to me [walking] off on her the day before." (DN 97-2, PagID.942).

The medical records do not document a visit on November 15, 2022. Lamar states that "she do[es] not recall any indication that Plaintiff was seriously injured" on that date. (DN 171-4, PageID.1629). An entry from November 16, 2022, authored by nurse Tracy Davis reveals that Plaintiff complained of "bilateral knee pain, right being worse than left and sore throat." (DN 171-2, PageID.1619). He also complained about medical charges. (*Id*.). Upon examination, Plaintiff exhibited "active and passive ROM bilateral knees without grimace." He was provided Motrin. (DN 171-2, PageID.1619). In his amended complaint, Plaintiff states that "Nurse Tracey Davis . . . addressed his injuries" with no further elaboration regarding his knee condition. (DN 78, PageID.544).

Taking Plaintiff's sworn allegation that Lamar walked out on him and refused to treat his knee pain as true, Plaintiff's claim nonetheless fails because the facts do not support the inference that his knee pain rose to the level of a serious medical need. There were no positive examination findings and Plaintiff considered his medical needs addressed. There is no evidence regarding the extent or severity of his knee condition to suggest it was anything more than *de minimis*. (DN 78, PageID.543-44). On these facts, Plaintiff's knee pain was not a serious medical need, as it was not diagnosed by a physician as mandating treatment or was so obvious that even a lay person would easily recognize the need for medical treatment. *See Blackmore*, 390 F.3d at 897 (noting that serious medical needs "involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem [whereas] delay or even denial of medical treatment for superficial, nonserious physical conditions does not constitute a [constitutional] violation.") (internal quotation omitted); *Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013) (superficial physical conditions, such as minor "cuts, bruising, and swelling" are not "serious medical needs" requiring medical treatment, for purposes of claims of unconstitutional deprivation of medical care); *Hammock v. Rogers*, No. 1:17-CV-1939, 2019 WL 7944420, at *14 (N.D. Ohio Nov. 13, 2019), *report and recommendation adopted*, No. 1:17-CV-1939, 2019 WL 6648973 (N.D. Ohio Dec. 6, 2019) (pretrial detainee did not provide evidence sufficient for a reasonable juror to determine that his injuries and knee problems were serious medical needs where "[m]edical records indicate that the injuries . . . a swollen lip, loose tooth, mild bruising and tenderness – were superficial, non-serious physical conditions that could be treated with ibuprofen and did not require medical treatment."). Accordingly, Plaintiff fails to raise a genuine dispute as to whether Lamar was deliberately indifferent to his serious medical needs.

For the foregoing reasons, the Court finds that Lamar is entitled to summary judgment on Plaintiff's Fourteenth Amendment deliberate indifference claim against her.

**3.**

Harris moves for summary judgment on the basis that Plaintiff has not presented evidence that Harris acted recklessly in the face of a known risk.  (DN 171, PageID.1587-90).

Plaintiff alleges that Harris improperly placed him on suicide watch for medication non-compliance, forced Plaintiff to take medication against his will, and failed to provide adequate mental health treatment.  (DN 78, PageID.551-52).

The record reflects that Harris met with Plaintiff on several occasions between November 14 and November 21, 2022, while Plaintiff was placed on suicide watch.  During that time, Harris counseled Plaintiff on medication compliance, due to Plaintiff's refusal to take Keppra as directed.  He referred Plaintiff to Troost and nursing staff regarding his medication.  Harris worked with Plaintiff on coping techniques and strategies, observing Plaintiff's behavior as "angry" and "aggressive" at times.  (DN 171-2, PageID.1613-26).  Harris agreed with Troost's decision to place Plaintiff on suicide watch due to "concern[ ] that [Plaintiff] may be engaging in self-destructive or self-injurious behavior."[10]  (DN 171-4, PageID.1629).

Plaintiff disputes the rationale for his placement on suicide watch, arguing that his "actions or behavior . . . does not justify the reason he was placed on suicide watch."  (DN 183, PageID.1826).  Plaintiff alleges no harm as a result of his placement, nor does he allege that any Defendant, including Harris, recklessly disregarded a substantial risk to his health while he remained on suicide watch.  Courts in this Circuit have held that unnecessary placement on suicide watch, standing alone, does not state a constitutional violation.  *Jones v. Lee*, No. 2:09-CV-11283, 2012 WL 683362, at *4 (E.D. Mich. Mar. 2, 2012), *report and recommendation*

---

[10] Plaintiff admits to "bang[ing] his head on the wall" once placed in the suicide watch cell.  (DN 78, PageID.543).

*adopted*, No. 09-11283, 2012 WL 1048541 (E.D. Mich. Mar. 28, 2012) ("Temporary placement on suicide watch, even when not necessary, does not implicate a liberty interest protected by the Due Process Clause nor does it amount to cruel and unusual punishment under the Eighth Amendment.") (collecting cases); *see also Hunter v. Williams*, No. 3:13-CV-00592, 2013 WL 3467097, at *2 (M.D. Tenn. July 10, 2013) ("Hunter's allegations that the defendants placed him on suicide watch for a period of two days after finding two Tylenol pills in his cell do not rise to the level of a due process or Eighth Amendment violation."); *Evans v. Bruge*, No. 1:20-CV-833, 2020 WL 5742748, at *7 (W.D. Mich. Sept. 25, 2020) (observing that "the Supreme Court has not discussed the unnecessary placement of a prisoner on suicide watch under the Eighth Amendment").

Plaintiff's argument that Harris forced him to take medication against his will is also without merit. (DN 183, PageID.1825-26). As stated earlier, Plaintiff refused to take Keppra on numerous occasions. In any event, there is no evidence of record that Harris, as a psychotherapist, had the authority to order, change, or administer prescription medication, and thus cannot be liable for violating plaintiff's Fourteenth Amendment rights for his role in Plaintiff's medication management. *Cf. Walker v. Eyke*, 417 F. App'x 461, 464 (6th Cir. 2011) (prison psychologist's failure to prescribe medication for prisoner's depression was not deliberate indifference to serious medical needs such to violate the Eighth Amendment, where psychologist had no authority to prescribe the drugs requested); *see generally Murphy v. Grenier*, 406 F. App'x 972, 974 (6th Cir. 2011) (personal involvement is necessary to establish section 1983 liability).

Plaintiff also does not raise a genuine dispute as to inadequate medical care or reckless disregard by Harris during Plaintiff's placement on suicide watch. While Plaintiff avers that,

"instead of addressing the Plaintiff's mental health concerns, Defendant Harris denied the Plaintiff mental health treatment or care[,]" *see* DN 183, PageID.1816, the record belies this assertion. Plaintiff testified that he saw a mental health professional at HCDC. (DN 68-5, PageID.388). He further states that "Defendant Harris visited the Plaintiff in his cell in an attempt to address the Plaintiff's mental health concerns. Defendant Harris documented the Plaintiff's displayed increased depression concerns[.]" (DN 183, PageID.1812). And the medical record demonstrates that Plaintiff saw Harris on May 20, 2022, June 30, 2022, July 15, 2022, August 8, 2022, and on several occasions between November 14 and November 21, 2022. (DN 97-2, PageID.978-98; DN 171-2, PageID.1613-22). Moreover, Plaintiff does not identify any actions by Harris that would establish that Harris acted with reckless disregard to a substantial risk. Thus, Plaintiff has failed to offer any evidence of Harris' reckless disregard, and the evidence of record, including his own testimony, contradicts his claim that he was denied treatment. *See Booher v. Montavon*, 555 F. App'x 479, 484 (6th Cir. 2014) (summary judgment proper where the medical evidence contradicts the plaintiff's allegations). Although Plaintiff believes that Harris should not have deferred Plaintiff's medication concerns to Troost, *see* DN 183, PageID.1816, there is no evidence that Harris had the authority to manage Plaintiff's medications. Moreover, Plaintiff's disagreement with Harris' cooperation with Troost regarding his care is not actionable. The law in this Circuit is clear that mere differences of opinion or disagreements between a prisoner and prison medical staff over the kinds of treatment a prisoner needs do not rise to the level of deliberate indifference. *See Darby v. Greenman*, 14 F.4th 124, 129 (2d Cir. 2021) (holding, after the modification of the second prong of the Fourteenth Amendment's deliberate indifference standard in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), that "a difference of opinion about the proper course of treatment" does not demonstrate

deliberate indifference).   Accordingly, Plaintiff fails to raise a genuine dispute as to whether Harris was deliberately indifferent to his serious medical needs.

For the foregoing reasons, the Court finds that Harris is entitled to summary judgment on Plaintiff's Fourteenth Amendment deliberate indifference claims against him.

**4.**

Weber seeks summary judgment on the basis that Plaintiff cannot establish a disregard by Weber to his serious medical needs because she did not treat Plaintiff or provide him medical care at HCDC.   (DN 171, PageID.1585-87).

Plaintiff's amended complaint alleges that Weber denied him due care and adequate medical treatment by failing to investigate his billing disputes regarding the copays assessed for his medical treatment at HCDC.   (DN 78, PageID.536, 558).   He further argues that Weber "neglected her duties to adequately apply charges and fee" in violation of "QCC and HCDC customs and practices."  (DN 183, PageID.1816).

It is undisputed that Weber is not a medical provider, and that she is not the policymaker for the copayment policy at Henderson County.

"The right to adequate medical care is guaranteed to convicted federal prisoners by the Cruel and Unusual Punishment Clause of the Eighth Amendment, and is made applicable to convicted state prisoners and to pretrial detainees (both federal and state) by the Due Process Clause of the Fourteenth Amendment." *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). However, that right does not entitle a plaintiff "to receive free medical care regardless of his financial circumstances."   *Slattery v. Mohr*, No. 2:11-CV-202, 2012 WL 2931131, at *8 (S.D. Ohio July 17, 2012), *report and recommendation adopted*, No. 2:11-CV-202, 2012 WL 3597512 (S.D. Ohio Aug. 21, 2012) (citing *Reynolds v. Wagner*, 128 F.3d 166, 174

(3d Cir.1997) ("If a prisoner is able to pay for medical care, requiring such payment is not deliberate indifference to serious medical needs.") (internal quotation marks omitted).  The Sixth Circuit has held that "it is constitutional to charge inmates a small fee for health care where indigent inmates are guaranteed service regardless of ability to pay." *White v. Corr. Med. Servs.*, 94 F. App'x 262, 262 (6th Cir. 2004); *see also Bailey v. Carter*, 15 F. App'x 245, 250 (6th Cir. 2001) (holding that Ohio law requiring fees for inmate medical visits did not violate the Eighth or Fourteenth Amendments).

Here, Plaintiff has not alleged that Weber denied him necessary medical care or medications because of his inability to pay.  (DN 183, PageID.1809, 1816).  As such, he has not set forth a constitutional infirmity.  *See Zain v. Advance Health Care Provider*, No. 4:12CV-P5-M, 2013 WL 4039052, at *4 (W.D. Ky. Aug. 7, 2013) (no constitutional violation where plaintiff was seen by a nurse, and $20 was deducted from his account); *Slattery*, No. 2:11-CV-202, 2012 WL 2931131, at *8 (granting summary judgment on deliberate indifference claim where "Plaintiff has not established that he has been denied needed medical care because he could not afford to purchase [medications].").

To the extent Plaintiff' seeks to assert a procedural due process claim premised upon the deductions from his inmate account vis-à-vis the erroneously billed medical copays, Plaintiff has not pleaded the absence of an adequate post-deprivation state remedy for billing errors in violation of HCDC policy.  As Plaintiff has not alleged or demonstrated any inadequate remedy for such copay billing disputes, he has failed to state a claim in this regard.  *Woods v. Knowles*, No. CIV.A.4:07CV-P109-M, 2007 WL 4104895, at *2–3 (W.D. Ky. Nov. 14, 2007) (dismissal for failure to state a claim where plaintiff alleged he was charged a copay in violation of jail

policy not to charge for follow-up medical visits).  Accordingly, Plaintiff fails to establish a constitutional violation by Weber based upon her handling of his copayment disputes.

For the foregoing reasons, the Court finds that Weber is entitled to summary judgment on Plaintiff's Fourteenth Amendment deliberate indifference claims against her.

## B.

QCC seeks summary judgment on Plaintiff's Fourteenth Amendment claims, arguing that Plaintiff has failed to present evidence of a QCC policy such to establish liability under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).  (DN 171, PageID.1591).

Plaintiff names QCC in his amended complaint "for its policies, procedures, rules, regulations, and/or practices that cause the Plaintiff to be deprived of rights guaranteed by Federal and state law."  (DN 78, PageID.523).

"To succeed on a municipal liability claim,[11] a plaintiff must establish that his or her constitutional rights were violated and that a policy or custom of the municipality was the 'moving force' behind the deprivation of the plaintiff's constitutional rights."  *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 573 (6th Cir. 2016) (citing *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 606–07 (6th Cir. 2007); *Monell*, 436 U.S. at 694.  The plaintiff must first "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403-04 (1997) (quoting *Monell*, 436 U.S. at 694).  Where the plaintiff cites an unofficial policy on behalf of the municipality, he must show that, while the policy was never "formally approved by an appropriate decisionmaker," it was nevertheless "so widespread as to have the force of law."  *Id*. at 404 (citing *Monell*, 436 U.S. at

---

[11] The same analysis that applies to a § 1983 claim against a municipality applies to a § 1983 claim against a private corporation, such as QCC.  *See Street v. Corr. Corp. of Am*., 102 F.3d 810, 818 (6th Cir. 1996) ("*Monell* involved a municipal corporation, but every circuit to consider the issue has extended the holding to private corporations as well.").  Therefore, liability of a contracted private entity also must be based on a policy or custom of the entity. *Street*, 102 F.3d at 818.

690-91). To that end, Plaintiff must show "the existence of a clear and persistent pattern of illegal activity." *Thomas v. City of Chatanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (quoting *Doe v. Cnty. of Claiborne*, 103 F.3d 495, 508 (6th Cir. 1996)). To establish a clear pattern, he must show more than "one instance of potential misconduct." *See id*. at 433-434 (rejecting "persistent pattern" argument because plaintiff "did not reach beyond the facts of [plaintiff's] case to show any possibility of a pattern"); *Winkler v. Madison Cnty.*, 893 F.3d 877, 902 (6th Cir. 2018) (same).

Plaintiff argues that "[p]roviding the Plaintiff medications to only address some of his [Plaintiff's] medical concerns and not all of them, is a well-established QCC policy, practice, and custom that was the moving force behind the Plaintiff being provided medications to treat his seizure and depression disorders, while intentionally and recklessly ignoring his chronic pain in his neck, leg, shoulder, arm, and ignoring his schizophrenia and anxiety." (DN 183, PageID.1807). The Court liberally construes Plaintiff's allegation as an assertion of an unofficial custom or policy by QCC. It must fail, however, as Plaintiff has not alleged, much less raised an issue of fact, that other detainees were subject to a similar deprivation. *See Nelson v. Corr. Corp. of Am.*, No. 1:13 CV 2615, 2016 WL 1060308, at *9 (N.D. Ohio Mar. 14, 2016) ("There is no evidence to establish a pattern of similar violations over time from which a jury might reasonably infer that the alleged failures were more than isolated events or that they were so 'persistent and widespread' so as to constitute official policies of [the defendant]."); *see also*, *e.g.*, *Savoie v. Oliver*, No. 2:23-CV-11357, 2024 WL 1758263, at *4 (E.D. Mich. Apr. 24, 2024) (granting motion to dismiss where plaintiff did not allege "that the delays in his medical care were part of a widespread, ongoing issue affecting other prisoners.").

In addition, QCC cannot be held liable absent an underlying constitutional violation. *Monell*, 436 U.S. at 694; *Burkey v. Hunter*, 790 F. App'x 40, 41 (6th Cir. 2020).  As discussed above, Plaintiff's Fourteenth Amendment claims fail as a matter of law because he has not shown that the Defendants acted with deliberate indifference to a substantial risk of serious harm.

For these reasons, the Court finds that QCC is entitled to summary judgment as to the Plaintiff's Fourteenth Amendment deliberate indifference claim.

## C.

Having granted summary judgment for QCC as to the federal law claims against it, to the extent that Plaintiff alleges a state law negligence claim (DN 1, PageID.6), the Court will dismiss it as well.  *See* 28 U.S.C. § 1367(c)(3) (noting that a district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (3) the district court has dismissed all claims over which it has original jurisdiction"); *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996) (where "all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims").

## V.     CONCLUSION

For the reasons set forth above, and the Court being otherwise sufficiently advised, **IT IS**

**ORDERED** that Defendants' motion for summary judgment (DN 170) is **GRANTED**.   All

federal claims against Defendants are dismissed with prejudice.

Date:    March 3, 2025

Joseph H. McKinley Jr., Senior Judge
United States District Court

cc:     Plaintiff, *pro se*
        Counsel of record
4414.015