UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION
CIVIL ACTION NO. 4:22-CV-P117-JHM

**LAMONE LAUDERDALE**                                                                 **PLAINTIFF**

v.

**AMY BRADY, et al.**                                                                 **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the motion for summary judgment filed by Defendants Jailer Amy Brady, Jailer Eddie Vaught, and Colonel Richard Hendricks (collectively, Defendants). (DN 172). Plaintiff Lamone Lauderdale filed a response to the motion (DN 192). For the following reasons, the motion for summary judgment will be granted.

### I.   BACKGROUND

This is a *pro se* 42 U.S.C. § 1983 prisoner civil rights action brought by a pretrial detainee previously incarcerated at the Henderson County Detention Center (HCDC). Plaintiff alleges numerous deprivations of his constitutional rights while detained at HCDC. He sues Defendants in their individual and official capacities. (DNs 1, 78).

Pursuant to 28 U.S.C. § 1915A, the Court permitted the following claims to proceed against Defendants: Fourteenth Amendment conditions of confinement; Fourteenth Amendment due process; and First Amendment freedom of religion/Religious Land Use and Institutionalized Persons Act (RLUIPA). Plaintiff's claims against Defendants in their official capacities were allowed to proceed under a theory of municipal liability based on the customs and policies of their employer, Henderson County. (DNs 6, 57).

Plaintiff's claims are as follows. He alleges overcrowding at HCDC, stating that 12 to 15 inmates were placed in cells with a capacity of ten, and that each cell was assigned two electronic tablets, which he claims caused hostility among inmates. (DN 1, PageID.5; DN 78, PageID.553-54).

Plaintiff further alleges that he was denied his right to practice his Muslim faith because there was insufficient space in his cell to allow for proper prayer practices. (DN 1, PageID.6; DN 78, PageID.556).

Plaintiff also alleges a due process violation arising from the removal of his mattress and bedroll for three days while he was placed in isolation. (DN 1, PageID.6; DN 78, PageID.558-59).

Finally, Plaintiff alleges that Brady and Vaught,[1] as Jailers of HCDC in their official capacities, created and enforced unconstitutional policies and procedures. (DN 1, PageID.6).

## II.   MOTION FOR SUMMARY JUDGMENT

### A.

Defendants seek summary judgment on Plaintiff's claims on the grounds that: (1) Plaintiff fails to present sufficient evidence to withstand summary judgment on his Fourteenth Amendment conditions of confinement claim; (2) Plaintiff fails to establish a violation of his free exercise rights under both the First Amendment and RLUIPA, and that his RLUIPA claim is moot; (3) Plaintiff fails to establish a due process violation arising out of his confinement to isolation; (4) Plaintiff fails to present evidence that Brady or Vaught directly encouraged or participated in unconstitutional conduct, as required for a failure to train or supervise claim; and (5) his official capacity claims must fail based on his failure to identify an

---

[1] Vaught was added as a party to this action when he succeeded Brady as HCDC Jailer. (DN 21).

unconstitutional policy by Henderson County, and his failure to establish an underlying constitutional violation. (DN 172-1, PageID.1633-46).

In support of their motion for summary judgment, Defendants submit the sworn affidavit of Hendricks; the transcript of Plaintiff's deposition; the Kentucky Department of Corrections (KDOC) Religion Reference manual; and HCDC records pertaining to Plaintiff, including grievance requests, incident reports, disciplinary hearing determinations, and medical encounter notes. (DN 172-2 through 172-17).

**B.**

Plaintiff has filed a response to Defendants' motion for summary judgment. (DN 192). In support thereof, Plaintiff submits a sworn declaration; HCDC's classification, use of force, and use of restraints policies; and his records from HCDC, which include medical encounter notes and medical intake screening form, and incident reports. (DNs 192-2 through 192-11).

**C.**

The following facts are undisputed unless otherwise noted. On May 10, 2022, Plaintiff was booked into HCDC as a pretrial detainee. (DN 192-3, PageID.1943). Identifying as Muslim, he requested a prayer rug on May 17, 2022, and was provided one. (DN 172-2, PageID.1649; DN 172-3, PageID.1650).

On May 22, 2022, Plaintiff submitted a grievance regarding insufficient time to read books and publications on electronic tablets because there were only two tablets for the 13-15 inmates in his cell. (DN 172-4, PageID.1660). A grievance response dated May 23, 2022, recommended that Plaintiff read in the evening hours when the tablets were not in use for messaging and visitation. (*Id.*). Plaintiff filed a grievance appeal on June 2, 2022, asserting that he "shouldn't be forced to wait until late night to use the tablet . . . ." (*Id.*, PageID.1661).

3

Plaintiff testified that HCDC officials never took the tablets from his cell or otherwise prevented him from using them, but felt that sharing so few tablets caused conflicts among the inmates. (DN 172-3, PageID.1651).

On June 17, 2022, Plaintiff was involved in an altercation with another inmate stemming from Plaintiff wanting to conduct a video visit while the other inmate was listening to music on the tablet. (DN 172-3, PageID.1651). Per the incident report, the altercation was described as a "mutual fight" by the officers who reviewed the security footage. (DN 172-5, PageID.1662). Plaintiff instead characterizes this incident as being "assaulted by another inmate due to the tablet usage." (DN 192-1, PageID.1896). Plaintiff refused medical treatment until June 23, 2022, at which time he was noted by the nurse to have small bruise and scratch under his left eye. (DN 172-7, PageID.1665). Following a disciplinary hearing on June 24, 2022, Plaintiff was found guilty of interfering with the security operations of the facility, failure to abide by schedules or rules, and fighting. (DN 172-8, PageID.1666). Plaintiff was ordered to spend 30 days in isolation and 14 days without commissary. (*Id.*).

On June 29, 2022, it was discovered that Plaintiff was hoarding medications in his cell. (DN 172-10, PageID.1668). At the time of this incident, Plaintiff was still on restrictions from the June 24, 2022, disciplinary hearing. On June 29, 2022, Plaintiff was immediately placed on bedding restriction, which meant that his bedding was removed from 6:00 a.m. to 10:00 p.m., and returned to him from 10:00 p.m. to 6:00 a.m. (DN 172-6, PageID.1663).

At the July 1, 2022, disciplinary hearing for hoarding his medication, Plaintiff was found guilty and ordered to spend an additional 30 days in isolation and 30 days without commissary. (DN 172-11, PageID.1672). He was also taken off bedding restriction at that time. (*Id.*). During his deposition, Plaintiff admitted to hoarding his medications. He further testified that his

4

bedding restriction lasted three days and that he was provided bedding from 10:00 p.m. to 6:00 a.m. on those days. (DN 172-3, PageID.1653-54).

On August 9, 2022, Plaintiff submitted a grievance asserting that his cellmates did not "respect [his] customs and beliefs" with respect to conducting his daily Islamic prayers in his cell. The grievance stated that he was "forced to alter" his prayer observance, otherwise his cellmates would "walk in as if [he was] not praying." (DN 172-12). Plaintiff explained during his deposition that his cellmates did not physically prevent him from praying, but that they were in personal space requiring him to "move about in one of the open areas[.]" (DN 172-3, PageID.1655-56).

On August 17, 2022, Plaintiff submitted a grievance requesting to immediately be moved to another cell "to avoid altercations and conflicts." He stated that he had been "doing [his] best to avoid the conflict," but had reached his "boiling point" and wished to address the issue before he "took matters into [his] own hands." (DN 172-13). The following day, HCDC officers questioned Plaintiff about his request and placed him in isolation. (DN 172-14).

On August 25, 2022, Plaintiff was moved back general population without incident. (DN 172-15).

On September 27, 2022, Plaintiff submitted another grievance asserting that he did not have adequate space to pray due to another inmate being placed in his cell. (DN 172-16). A grievance response advised Plaintiff, "[y]ou may worship as you wish in your cell. There is no requirement for inmates to . . . be housed differently based on the requirements of your religious preference in the DOC religious reference manual." (*Id.*).

5

### III. LEGAL STANDARD

Before the Court may grant a motion for summary judgment, it must find that there is "no genuine dispute as to any material fact" and that the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

Assuming the moving party satisfies its burden of production, the nonmovant "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Celotex*, 477 U.S. at 324). The non-moving party's evidence is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in favor of the party opposing summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The fact that a plaintiff is *pro se* does not lessen his or her obligations under Rule 56. "The liberal treatment of *pro se* pleadings does not require the lenient treatment of substantive law, and the liberal standards that apply at the pleading stage do not apply after a case has progressed to the summary judgment stage." *Johnson v. Stewart*, No. 08-1521, 2010 WL 8738105, at *3 (6th Cir. May 5, 2010) (citations omitted). However, statements in a verified complaint that are based on personal knowledge may function as the equivalent of affidavit statements for purposes of summary judgment. *Weberg v. Franks*, 229 F.3d 514,

526 n.13 (6th Cir. 2000); *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992); *see also Carr v. Metro Gov't*, No. 3:19-CV-P449-CHB, 2022 WL 4686993, at *3–4 (W.D. Ky. Sept. 30, 2022).

## IV. DISCUSSION

### A. Conditions of Confinement

While the Eighth Amendment provides a convicted prisoner the right to be free from cruel and unusual punishment, it is the Due Process Clause of the Fourteenth Amendment that provides the same protections to pretrial detainees. *Thomas v. Mayfield Police Dep't*, No. 5:21-CV-P97-TBR, 2021 WL 6135560, at *4 (W.D. Ky. Dec. 29, 2021) (citing *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018)). Thus, the Fourteenth Amendment applies to conditions of confinement claims brought by pretrial detainees. *Bensfield v. Murray*, No. 4:21-CV-P104-JHM, 2022 WL 508902, at *2 (W.D. Ky. Feb. 18, 2022) (citing *Brawner v. Scott Cnty.*, 14 F.4th 585, 591 (6th Cir. 2021)). This standard has two prongs. To satisfy the first, or objective prong, a plaintiff must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Contemporary standards of decency determine whether conditions of confinement meet this standard. *See*, *e.g.*, *Hadix v. Johnson*, 367 F.3d 513, 525 (6th Cir. 2004) (citing *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)). Contemporary standards of decency are violated only by "extreme deprivations" which deprive the prisoner of the "minimal civilized measure of life's necessities." *Id.* (citing *Hudson v. McMillian*, 503 U.S. 1, 9, (1992)). To satisfy the second prong under the Fourteenth Amendment, a plaintiff must show that defendants acted "deliberately" and "recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be

known.'" *Brawner*, 14 F.4th at 596 (quoting *Farmer*, 511 U.S. at 836).[2]  Stated another way, "[a] pretrial detainee must prove 'more than negligence but less than subjective intent—something akin to reckless disregard.'" *Id.* at 596–97 (quoting *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (*en banc*)).

Plaintiff challenges the conditions of his confinement at HCDC as unconstitutional because, due to overcrowding, he was housed in a cell designed for ten inmates, but regularly held up to 15. Additionally, each cell was assigned only two tablet computers for inmates to share, causing hostility and violence among the inmates. (DN 192-1, PageID.1906-22). Defendants seek summary judgment on Plaintiff's conditions of confinement claim, arguing that Plaintiff does not show that he suffered an extreme deprivation as a result of cell overcrowding and limited access to tablets. (DN 172-1, PageID.1638).

As explained by the Sixth Circuit, "overcrowding is not, in itself, a constitutional violation," unless it results "in an unconstitutional denial of such basic needs as food, shelter, or sanitation." *Agramonte v. Shartle*, 491 F. App'x 557, 560 (6th Cir. 2012) (citing *Wilson v. Seiter*, 501 U.S. 294, 298, (1991); *Rhodes*, 452 U.S. at 345–48). Thus, only "extreme deprivations" can "support a prison-overcrowding claim." *Agramonte*, 491 F. App'x at 560 (internal quotation marks omitted).

Plaintiff primarily takes issue with the limited number of shared tablet computers for each cell, requiring him to read during evening hours when the tablets are used less frequently. (DN 192, PageID.1912-13; *see also* DN 172-3, PageID.1650-51; DN 172-4). In opposing Defendants' motion for summary judgment, he states that tablets are "a necessity for inmates at

---

[2] The objective prong for Eighth and Fourteenth Amendment conditions of confinement claims is the same. *See Mitchell v. Phillips*, No. 5:24-CV-P53-JHM, 2024 WL 4729313, at *2 (W.D. Ky. Nov. 8, 2024). As such, the Court will cite to case law applying the Eighth Amendment objective standard where instructive.

HCDC, and the lack of such utilization of the tablets creates obvious substantial burdens, while creating a genuine dispute of material fact for trial." (DN 192, PageID.1910). However, "[t]elevision, electronic games and computers are not necessities like food, medical care or sanitation, and an absence of these items is not a condition that is 'intolerable for prison confinement.'" *Richards v. Snyder*, No. 1:14-CV-84, 2015 WL 3658836, at *14 (W.D. Mich. June 12, 2015) (quoting *Rhodes*, 452 U.S. at 347–48) and citing *Coleman v. Gov. of Mich.*, 413 F. App'x 866, 875 (6th Cir. 2011) (no constitutional right to access a television)). Plaintiff having to limit his tablet usage to the evening hours is not an extreme deprivation, but rather the type of routine discomfort, annoyance, or inconvenience of prison life that does not suffice to implicate the protections of the Fourteenth Amendment. *See Alward v. Newell*, No. 4:24CV0935, 2024 WL 3849913, at *3 (N.D. Ohio Aug. 16, 2024) (observing that, "the Eighth Amendment affords the constitutional minimum protection against conditions of confinement which constitute health threats, but does not address those conditions which cause the prisoner to feel merely uncomfortable or which cause aggravation or annoyance."); *see also Agramonte*, 491 F. App'x at 559-60 (holding that plaintiff's allegations that the number of toilets, showers, wash basins, and showers had not increased with the increased population, that there were lines to use the bathrooms and showers, and that there were no comfortable places to sit to watch television or write letters failed to state an overcrowding claim because plaintiff failed to allege an unconstitutional denial of basic needs). Thus, Plaintiff's Fourteenth Amendment conditions of confinement claim arising from tablet access fails as a matter of law.

Plaintiff also argues that the crowded conditions resulted in greater violence and hostility among inmates. (DN 192-1, PageID.1912-13). In support thereof, Plaintiff cites to the June 17, 2022, altercation with his cellmate over the use of a tablet computer. (*Id.*, *see also* DN 172-3,

9

PageID.1652; DN 172-5). Plaintiff fails to "produce evidence establishing that [overcrowding] itself caused greater violence," *Rhodes*, 452 U.S. at 343, but instead points to a single incident involving a dispute over a communal electronic device. This tenuous link is insufficient to establish a disproportionate increase in inmate violence and that such violence was caused by cell overcrowding. *See Rouse v. Caruso*, No. 06-CV-10961-DT, 2011 WL 918327, at *22 (E.D. Mich. Feb. 18, 2011), *report and recommendation adopted*, No. 06-CV-10961, 2011 WL 893216 (E.D. Mich. Mar. 14, 2011) (granting summary judgment where plaintiffs produced "no evidence . . . of a causal connection between the crowded conditions and the incidents of violence," nor presented "any evidence regarding the frequency of fights over time as the occupancy of the prison has increased."); *see also Rhodes*, 452 U.S. at 343 (evidence of increased violence in proportion to the increase in population itself refuted a claim of cruel and unusual punishment). On this record, a reasonable juror could not conclude that the overcrowding at HCDC contributed to a substantial risk of excessive inmate-on-inmate violence.

Because Plaintiff fails to raise a triable issue of fact as to whether the overcrowded conditions at HCDC resulted in an unconstitutional denial of basic needs, the Court finds that Defendants are entitled to summary judgment on Plaintiff's Fourteenth Amendment conditions of confinement claim.[3]

### B. Religious Exercise

The First Amendment provides, in relevant part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. "Prisoners retain the First Amendment right to the free exercise of their religion." *Hayes v. Tenn.*, 424 F. App'x 546, 549 (6th Cir. 2011) (citing *Walker v. Mintzes*,

---

[3] Having found that Plaintiff's claim fails on the objective prong, the Court need not consider the subjective prong of the Fourteenth Amendment standard.

10

771 F.2d 920, 929 (6th Cir. 1985)). "A prisoner alleging that the actions of prison officials violate his religious beliefs must show that 'the belief or practice asserted is religious in the person's own scheme of things' and is 'sincerely held.'" *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (citation omitted). A violation of the First Amendment requires the imposition of a "substantial burden" on a plaintiff's exercise of his religion. *Welch v. Spaulding*, 627 F. App'x 479, 485 (6th Cir. 2015). "If a prison regulation infringes on a sincerely held religious belief, it is valid only if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).

In *Turner*, the Supreme Court identified four factors to aid in determining whether the policy is "reasonably related to legitimate penological interests": "(1) whether there is a valid, rational connection between the prison policy and the legitimate governmental interest asserted to justify it; (2) the existence of alternative means for inmates to exercise their constitutional rights; (3) the impact that accommodation of these constitutional rights may have on other guards and inmates, and on the allocation of prison resources; and (4) the absence of ready alternatives as evidence of the reasonableness of the regulation." *Cornwell v. Dahlberg*, 963 F.2d 912, 917 (6th Cir. 1992) (citing *Turner*, 482 U.S. at 89); *see also Harbin-Bey v. Rutter*, 420 F.3d 571, 578 (6th Cir. 2005).

"If the restriction or practice [is] reasonably related to legitimate prison concerns, there is no violation of the First Amendment." *Human Rights Def. Ctr. v. Washington*, No. 1:19-CV-12470, 2021 WL 2895192, at *6 (E.D. Mich. July 9, 2021). Courts are to give "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*,

539 U.S. 126, 132 (2003). As the Sixth Circuit has noted, "a trial court is not required to weigh evenly, or even consider explicitly, each of the four *Turner* factors." *Spies v. Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999) (citations omitted). Rather, "[t]he four *Turner* factors are . . . simply 'relevant' to the ultimate inquiry a court must undertake 'when a prison regulation impinges on inmates' constitutional rights': determining whether a prison regulation is 'reasonably related to legitimate penological interests.'" *Id.* (quoting *Turner*, 482 U.S. at 89).

Plaintiff, who identifies as Muslim, asserts that Defendants unconstitutionally infringed upon his free exercise of religion because he did not have sufficient cell space in which to pray. (DN 78, PageID.556). Specifically, he argues that he had to alter his prayer times or not pray at all due to interruptions by his cellmates. (DN 192, PageID.1926-30). Plaintiff states generally that the record supports the contention that his religious practice was substantially burdened. (*Id.*).

Defendants, in seeking summary judgment, argue that Plaintiff's ability to practice Islam has not been substantially burdened by the requirement that Plaintiff pray in his cell and, in any event, this requirement is reasonably related to legitimate penological interests. (DN 172-1, PageID.1639-41).[4]

The record contains Plaintiff's August 9, 2022, grievance, which stated that his cellmates did not "respect [his] customs and beliefs" with respect to conducting his daily Islamic prayers in his cell, and that he was "forced to alter" his prayer observance, otherwise his cellmates would "walk in as if [he was] not praying." (DN 172-12). To that end, Plaintiff testified that his cellmates did not physically prevent him from praying, but that they occupied his personal space requiring him to "move about in one of the open areas[.]" (DN 172-3, PageID.1655-56).

---

[4] The Court presumes, for purposes of this motion, that Plaintiff's religious beliefs are sincerely held, as Defendants do not directly argue otherwise. (*Id.*, PageID.1639).

12

Also present in the record is the HCDC Religious Reference Manual, which provides that "[o]nce the [Islamic] prayer has started, the inmate shall be allowed to finish without interruption." (DN 172-17, PageID.1681). An affidavit by Hendricks explains, however, "to allow [Plaintiff] and the other 30+ HCDC inmates who identify as Muslim to leave their cells five times a day for prayer would pose a security risk and place an unreasonable burden on HCDC staff and resources." (DN 172-6; DN 172-17).

The Court finds that the record sufficiently raises an issue of fact as to whether Plaintiff's religious practice was substantially burdened by HCDC's requirement of in-cell prayer. That said, the Court finds that the policy set forth in Hendricks' affidavit is rationally related to the legitimate penological interest of security and resource concerns. The Sixth Circuit has addressed a similar issue, concluding that a "prison policy that prevented [the plaintiff] and other Muslim inmates from leaving their cubicles five times a day to pray was reasonably related to the legitimate penological interest in limiting inmates' movements within the prison." *Davis v. Michigan Dep't of Corr.*, No. 19-2264, 2020 WL 6364583, at *2 (6th Cir. Sept. 1, 2020) (citing *O'Lone v. Shabazz*, 482 U.S. 342, 351 (1987); *Turner*, 482 U.S. at 89). In affirming the district court's grant of summary judgment, the circuit court reasoned, "having to move inmates several times a day would affect the prison's security and resources, and [the plaintiff] did not offer a ready alternative at *de minimis* cost to the prison's penological interests." *Id.* (citation omitted).

Plaintiff does not controvert Defendants' rationale, and as in *Davis*, he does not suggest a readily available alternative that would accommodate his rights at a *de minimis* cost to penological interest. *See Turner*, 482 U.S. at 89-91. Thus, even if Plaintiff's religious practice was substantially burdened by HCDC's policy requiring in-cell prayer, the policy was

nonetheless reasonably related to a legitimate penological interest under *Turner*. *See Davis*, 2020 WL 6364583, at *2. As such, there is no violation of the First Amendment. *Human Rights Def. Ctr.*, 2021 WL 2895192, at *6 ("[i]f the restriction or practice [is] reasonably related to legitimate prison concerns, there is no violation of the First Amendment.").

The Court next turns Plaintiff's clam under RLUIPA.

"RLUIPA . . . represents an effort to protect religious liberties by statute," *Haight v. Thompson*, 763 F.3d 554, 566 (6th Cir. 2014), the text of which provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to [a prison] . . . unless the government demonstrates that imposition of the burden on that person: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1(a).

As Defendants point out in their memorandum of law (DN 172-1, PageID.1642), this Court previously observed in its May 18, 2023, Memorandum Opinion and Order that Plaintiff's RLUIPA claim is moot by virtue of his release from HCDC. (DN 57). To reiterate, Plaintiff's complaint seeks monetary damages and injunctive relief. (DN 1, PageID.7; DN 78, PageID.559). Monetary damages are not available under RLUIPA, regardless of whether the defendants are named in their individual or official capacities. *See Haight*, 763 F.3d at 568; *see also Owens v. Schuette*, No. 2:24-CV-10787, 2024 WL 4469086, at *7 (E.D. Mich. Oct. 10, 2024) (finding, and citing cases holding, that *Haight* applies to county and municipal defendants). Therefore, the only available remedy for a RLUIPA claim is injunctive relief. However, Plaintiff was transferred from HCDC on December 15, 2022 (DN 172-3, PageID.1656), rendering his request for injunctive relief moot. *See Moore v. Curtis*, 68 F. App'x 561, 562 (6th Cir. 2003) (citing *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996));

14

*see also Owens*, 2024 WL 4469086, at *6.  Plaintiff does not refute Defendants' argument in his response opposing summary judgment.  (DN 192-1, PageID.1926-31).  Accordingly, the Court finds that Plaintiff's RLUIPA claim is subject to dismissal.

Because Plaintiff has failed to identify a genuine dispute with respect to his free exercise claim under the First Amendment, and because his claim under RLUIPA is moot, the Court finds that Defendants are entitled to summary judgment on Plaintiff's First Amendment and RLUIPA claims.

### C. Due Process

"The Fourteenth Amendment's Due Process Clause constrains governmental decisions that deprive individuals of certain protected interests." *Finley v. Huss*, 102 F.4th 789, 812 (6th Cir. 2024) (citing *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)).  "A procedural due process claim involves two steps.  The plaintiff must first demonstrate the presence of a constitutionally protected 'property' or 'liberty' interest.  Then, the plaintiff must show that a state actor deprived him of that interest without affording him constitutionally sufficient process."  *Finley*, 102 F.4th at 812 (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 459–60 (1989)).

In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Supreme Court set forth the standard for determining when a state-created right creates a federally cognizable liberty interest protected by the Due Process Clause.  Under *Sandin*, a prisoner is entitled to the protections of due process only when the sanction "will inevitably affect the duration of his sentence" or when a deprivation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents

of prison life." *Sandin*, 515 U.S. at 486–87; *see also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790–91 (6th Cir. 1995).[5]

Plaintiff asserts a due process claim arising out of his bedding restriction while in isolation at HCDC, arguing that he had a liberty interest in his mattress and bedroll, which were removed as part of his disciplinary segregation. (DN 192-1, PageID.1924).

Defendants seek summary judgment on Plaintiff's Fourteenth Amendment due process claim on the basis that the temporary removal of bedding does not constitute an atypical and significant hardship such to give rise to a constitutional violation. (DN 172-1, PageID.1643).

Defendants produce evidence that Plaintiff was placed on "bedding restriction" from 6:00 am to 10:00 pm for three days following the discovery of Plaintiff hoarding medication in his cell. (DN 712-6, PageID.1663). Plaintiff testified, and does not dispute, that he had access to his bedding between 10:00 pm and 6:00 am (sleeping hours) during the three-day restriction. (DN 172-3, PageID.1654). He testified, however, that these hours were not "adequate" because they did not allow him sufficient time to "do all of the stuff that [he needed] to do." (*Id.*).

The Court agrees with Defendants that, on the undisputed record, Plaintiff fails to establish a Fourteenth Amendment procedural due process claim because a three-day bedding

---

[5] The Court applies *Sandin* to analyze Plaintiff's procedural due process claim. *See Johnson v. Grayson Cnty., Ky. Det. Ctr.*, No. 21-5772, 2022 WL 3479501, at *2 (6th Cir. May 27, 2022) (acknowledging the absence of Sixth Circuit precedent deciding whether *Sandin*'s atypical and significant hardship standard governs procedural due process claims brought by pretrial detainees); *see also Lyons v. Barry Cnty. Jail*, No. 1:24-CV-1162, 2025 WL 262142, at *8 (W.D. Mich. Jan. 22, 2025) ("There is some question as to whether *Sandin* provides the proper measure for changes in the conditions of confinement for pretrial detainees. . . . Arguably, *Sandin*'s hardship test is flexible enough to address the conditions of confinement for pretrial detainees."); *cf. Dilworth v. Adams*, 841 F.3d 246, 252 (4th Cir. 2016) (applying *Bell v. Wolfish*, 441 U.S. 520 (1979) to pretrial detainee due process claims). However, the Court notes that Plaintiff's claim would fail regardless of the standard employed. The undisputed record shows that Plaintiff was placed on a three-day bedding restriction during waking hours following the discovery that he was hoarding medication in his cell. As such, the restriction was legitimate and non-punitive. *See Bell*, 441 U.S. at 539; *see also Lyons*, 2025 WL 262142, at *9 (W.D. Mich. Jan. 22, 2025) (detainee's claimed deprivation of "out of cell programming" failed to state a claim under either *Sandin* or *Dilworth*); *cf. Cooper v. Montgomery Cnty., Ohio*, No. 3:13-CV-272, 2017 WL 2841678, at *13 (S.D. Ohio June 30, 2017), *aff'd sub nom. Cooper v. Montgomery Cnty., Ohio Sheriff's Dep't*, 768 F. App'x 385 (6th Cir. 2019) (a reasonable jury could find that completely depriving pretrial detainee of a mattress for four months constituted impermissible punishment).

restriction during waking hours does not constitute an atypical and significant hardship under *Sandin*. *Velasquez v. Lewis*, No. 4:20CV-00172-JHM, 2022 WL 1914072, at *3 (W.D. Ky. June 3, 2022) (daily removal of pretrial detainee's mattress and bedding during waking hours while in isolation was not an atypical and significant hardship); *see also Carter v. Ricumstrict*, No. 07-13311, 2008 WL 4225844, at *9 (E.D. Mich. Sept. 10, 2008) (granting summary judgment where "[t]emporary removal of Plaintiff's mattress, as a result of his misconduct involving the mattress, and replacing it with an isolation blanket does not involve atypical discipline for such misconduct. He has no liberty interest in these matters.").

Because Plaintiff's bedding restriction does not amount to an atypical or significant hardship, the Court finds that Defendants are entitled to summary judgment on his Fourteenth Amendment procedural due process claim.

### D. Official Capacity Claims

Plaintiff brings his constitutional claims against the named Defendants in their official capacities (DNs 1, 78), which the Court construes as claims against Henderson County based on its customs and policies.[6] *See Kentucky. v. Graham*, 473 U.S. 159, 165-166 (1985).

Defendants move for summary judgment on the grounds that Plaintiff has not identified an unconstitutional policy by Henderson County, nor has he established underlying constitutional violations, thereby precluding the imposition of municipal liability. (DN 172-1, PageID.1646).

Under § 1983, a municipality can be held liable only if the plaintiff demonstrates that the injury suffered was a direct result of the municipality's official policy or custom. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). "[A] municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id*.; *Searcy v. City of Dayton*,

---

[6] *See* DNs 6 and 57.

38 F.3d 282, 286 (6th Cir. 1994). "[T]he touchstone of 'official policy' is designed 'to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 138 (1988) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80 (1986)). To demonstrate municipal liability, a plaintiff "must (1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that his particular injury was incurred due to execution of that policy." *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003).

Plaintiff does not identify an unconstitutional policy or custom by Henderson County. Instead, he posits that "the record herein has presented well defined claims connecting HCDC policies with the unconstitutional deprivations of the plaintiff's conditions of confinement, due process, [and] free exercise/RLUIPA . . . . Such policies and customs were the motivating factors that caused such deprivations." (DN 192-1, PageID.1939). Plaintiff's conclusory assertions are insufficient to withstand summary judgment. *Brown v. City of Detroit*, No. CV 12-13402, 2017 WL 2532964, at *9 (E.D. Mich. Mar. 7, 2017), *report and recommendation adopted*, No. 12-13402, 2017 WL 2500995 (E.D. Mich. June 9, 2017) ("Brown does not identify a particular policy or custom that caused his injury, and instead offers only a conclusory and circular assertion that one must exist as a result of the circumstances as he alleges them. . . . Such conclusory, self-serving assertions are insufficient to demonstrate that a policy or custom was in place, and thus, are insufficient to withstand summary judgment."); *see generally Wright v. Murray Guard, Inc*., 455 F.3d 702, 713 (2006) (in opposing summary judgment, arguments consisting of conclusory allegations unsupported by any evidence cannot create a genuine issue of material fact).

To the extent Plaintiff's claims can be construed as alleging a policy of inadequate training or supervision by Henderson County (DN 192-1, PageID.1937-38),[7] they too would be unsuccessful for substantially the same reasons as above. A plaintiff must show that: "1) the [county's] training program was inadequate for the tasks that [its employees] must perform; 2) the inadequacy was the result of the [county's] deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury." *Jackson v. City of Cleveland*, 925 F.3d 793, 834 (6th Cir. 2019).

Plaintiff does not identify a training policy, nor does he explain how the allegedly deficient training caused any alleged injury described herein. Again, this is insufficient to overcome summary judgment. *See Grier v. Cuyahoga Cnty.*, No. 1:20-CV-1919, 2022 WL 103295, at *6 (N.D. Ohio Jan. 11, 2022) (granting summary judgment on *Monell* claims where plaintiff failed to produce a training policy of the County, identify perceived flaws in the training policy, or produce any evidence of faulty supervision).

Finally, Henderson County cannot be held liable absent an underlying constitutional violation. *Monell*, 436 U.S. at 694; *Burkey v. Hunter*, 790 F. App'x 40, 41 (6th Cir. 2020). As discussed above, Plaintiff has not shown a violation of his constitutional rights under the First or Fourteenth Amendments.

For these reasons, the Court finds that Defendants are entitled to summary judgment on Plaintiff's official capacity claims.

---

[7] The Court notes that Plaintiff broadly asserted a claim against Defendants, individually, for their failure to train and discipline staff. (DN 1, PageID.5; DN 78, PageID.546-49). Relatedly, Plaintiff sought to impute liability for all of the unconstitutional acts described in his complaint to the individual Defendants based solely on their supervisory roles. (*Id.*). However, this Court previously determined in its May 18, 2023, Memorandum Opinion and Order that Plaintiff's allegations under a failure to train theory lacked sufficient factual content to plausibly suggest entitlement to relief. Moreover, Plaintiff failed to allege the individual Defendants' personal involvement in order advance his claims under a theory of *respondeat superior* or supervisory liability. (DN 57, PageID.292-93). In finding these claims futile, the Court also observed that Plaintiff's official capacity claims withstood its initial screening. (*Id.*). As such, the Court addresses Plaintiff's claim under a municipal liability theory.

## F. State Law Claims

Having granted summary judgment for Defendants, to the extent any state law claim is asserted,[8] the Court will dismiss it as well. *See* 28 U.S.C. § 1367(c)(3) (noting that a district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (3) the district court has dismissed all claims over which it has original jurisdiction"); *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996) (where "all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims").

### V. CONCLUSION

For the reasons set forth above, and the Court being otherwise sufficiently advised, **IT IS ORDERED** that Defendants' motion for summary judgment (DN 172) is **GRANTED**. All federal claims against Defendants are dismissed with prejudice.

Date: March 25, 2025

*[Signature]*
Joseph H. McKinley Jr., Senior Judge
United States District Court

cc: Plaintiff, *pro se*
    Counsel of record
4414.015

---

[8] Plaintiff appeared to allege a claim of negligence against Defendant Brady in his original complaint, but did not expound upon this claim in subsequent filings or in his response to summary judgment. (DN 1, PageID.5).