UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION
CIVIL ACTION NO. 4:22-CV-P117-JHM

LAMONE LAUDERDALE                                                    PLAINTIFF

v.

AMY BRADY, et al.                                                   DEFENDANTS

<u>**MEMORANDUM OPINION AND ORDER**</u>

This matter is before the Court on the motion for summary judgment filed by Defendants Colonel Leslie Gibson, Major William Payne, Officer Andrew Brickner, and Lieutenant Rickey Jay (collectively, Defendants). (DN 173). Plaintiff Lamone Lauderdale filed a response to the motion. (DN 192). For the following reasons, the motion for summary judgment will be granted.

**I.     BACKGROUND**

This is a *pro se* 42 U.S.C. § 1983 prisoner civil-rights action brought by a pretrial detainee previously incarcerated at the Henderson County Detention Center (HCDC), alleging numerous deprivations of his constitutional rights while detained at HCDC. (DNs 1, 78).

Pursuant to 28 U.S.C. § 1915A, the Court permitted the following claims to proceed against Defendants: a Fourteenth Amendment conditions of confinement claim against Gibson, based on overcrowding and lack of recreation time; a Fourteenth Amendment excessive force claim against Brickner and Jay based on a physical force incident on November 15, 2022; a related Fourteenth Amendment against Payne based on his failure to intervene in the physical force incident; and a Fourteenth amendment due process claim against Payne based on Plaintiff's placement on suicide watch. (DNs 6, 57).

Plaintiff's claims are as follows. As to the conditions of his confinement, Plaintiff alleges overcrowding at HCDC, stating that 12 to 15 inmates were placed in cells with a capacity of ten.

(DN 1, PageID.5; DN 78, PageID.553-54).  Additionally, Plaintiff claims that between May 10, 2022, and July 1, 2022, he was allowed recreation 14 times in 51 days.  (DN 78, PageID.535).

Plaintiff next alleges that he was subjected to excessive force when he was choked by Brickner and Jay and maced by Jay during his transfer to a suicide watch isolation cell on November 15, 2022.  (DN 78, PageID.543, 555).  He further states that Payne was present during the use of force incident but failed to intervene.  (*Id*., PageID.555, 557).

Finally, Plaintiff alleges that Payne violated his due process rights by placing him on suicide watch as a means of punishment.  (*Id*., PageID.558).

## II.   Motion for Summary Judgment

### A.

Defendants seek summary judgment on Plaintiff's claims on the grounds that: (1) Plaintiff fails to establish a Fourteenth Amendment violation based upon his conditions of confinement, *i.e.*, overcrowding and lack of recreation time; (2) Plaintiff's claim of excessive force fails because the force utilized by Brickner and Jay was not objectively unreasonable; (3) Plaintiff's failure to intervene claim against Payne must necessarily fail because there was no unconstitutional use of force by Brickner and Jay; and (4) Plaintiff fails to establish a due process violation based on his placement on suicide watch because his confinement did not present an atypical or significant hardship.  (DN 173-1, PageID.1690-98).

In support of their motion for summary judgment, Defendants submit a memorandum of law; sworn affidavits by Gibson, Payne, Brickner, and Jay; Plaintiff's HCDC records, which include grievance requests, incident reports, disciplinary hearing documents, cell and recreation logs, and observation notes; and video surveillance footage of Plaintiff's cell transfer on November 15, 2022.  (DNs 173-1 through 173-14; DN 204).  Defendants also incorporate by reference

2

portions of the motions for summary judgment submitted by Richard Hendricks and Eddie Vaught in this proceeding.  (DNs 71 and 172).

## B.

Plaintiff has filed a response to Defendants' motion for summary judgment.  (DN 192).  In support thereof, Plaintiff submits a sworn declaration; HCDC's policies relating to classification, use of force, and use of restraints; and Plaintiff's institutional records from HCDC, which include an intake screening form, incident reports, and medical and observation notes.  (DNs 192-1 through 192-11).

## C.

The following facts are undisputed unless otherwise noted.  On May 10, 2022, Plaintiff was booked into HCDC as a pretrial detainee.  (DN 192-3, PageID.1943).

On August 17, 2022, Plaintiff submitted a grievance asking to be moved to another cell to avoid conflicts with his cellmates.  (DN 173-2, PageID.1701).  In the grievance, he stated he had "reached [his] boiling point" and "was about to take matters into his own hands."  (*Id.*).  The following day, HCDC officers questioned Plaintiff about his request and placed him in isolation.  (DN 172-3).  On August 24, 2022, HCDC staff offered to move Plaintiff to other housing areas, but he refused and remained in isolation.  (DN 173-4).  On August 25, 2022, Plaintiff was moved back general population without incident.  (DN 172-15).

On November 15, 2022, while housed in isolation pursuant to an unrelated incident,[1] Plaintiff was placed on suicide watch by medical staff for refusing to take his seizure medication.  (DN 173-5, PageID.1704-05; DN 173-6, PageID.1706).  Plaintiff does not dispute that he refused

---

[1] *See* DNs 173-6; 173-12; 192-4.

to take his medication, but asserts that he was "exercising [his] right not to take medications that are not court ordered . . . ." (DN 192-1, PageID.1898).

According to Gibson, this required moving Plaintiff to another isolation cell, removing his uniform (which could be fashioned into a noose), and placing him in an anti-suicide smock. (DN 173-7, PageID.1707). Per Jay's incident report dated November 15, 2022, Jay arrived at Plaintiff's cell to escort him to the suicide watch cell. Plaintiff became agitated and stated that he was not going on suicide watch, refusing multiple orders to exit his cell. (DN 173-6, PageID.1706; DN 173-8). Payne, Brickner, and two other officers arrived to assist. Plaintiff remained noncompliant and was placed in handcuffs before being escorted to a suicide watch cell. (*Id.*).

Once inside the new isolation cell, Plaintiff was ordered to kneel so his handcuffs could be removed. However, he became confrontational, resistant, and intentionally slammed his head against the wall. (*Id.*; DN 173-8; DN 173-9). Brickner and Jay applied force to Plaintiff to gain control of him so his handcuffs could be taken off. (*Id.*). Plaintiff was ordered to lie down so that his handcuffs could be removed. Payne placed his taser on Plaintiff's back but did not discharge, and Plaintiff ultimately complied. (*Id.*). Once Plaintiff's handcuffs were removed, he was directed to remove his facility uniform, but again he did not comply. Brickner, Jay, and a third officer gained control over Plaintiff to assist in the removal his uniform. (*Id.*; DN 173-8; DN 173-9). When the officers left the cell, Plaintiff began "mule kicking" and banging his head against the cell door. (*Id.*). Jay then opened the door and discharged a one-second burst of "OC spray[2]" to Plaintiff's facial area. (*Id.*). Approximately 20 minutes later, Plaintiff received a decontamination shower, and his cell was cleaned. Plaintiff was checked and cleared by medical. (*Id.*).

---

[2] The Court notes that Plaintiff refers to the chemical agent he was sprayed with as "mace," while Defendants use the terms "OC spray" and pepper spray interchangeably. The Court treats the three terms as one in the same for purposes of this motion.

4

Plaintiff disputes portions of this version of events.  He asserts that both Brickner and Jay placed him in a chokehold, despite that he was "not hostile nor a threat to [himself] or others." (DN 192-1, PageID.1899).  Plaintiff asserts that he was not "mule kicking" the cell door, but instead banged his head against it once.  (*Id.*, PageID.1934).  He states that Jay "maced [him] without warning," and that Payne "authorized and condoned" the officers' conduct by "giving the okay, and not intervening to prevent their actions."  (*Id.*).  Plaintiff states that he was seen by medical for injuries as a result of the use of force by Brickner and Jay.  (*Id.*).

Following a disciplinary hearing on November 17, 2022, Plaintiff was found guilty of interfering with the security operations of the facility, failure to abide by schedules or rule, disobeying a deputy, unnecessary noise, and repeated major violations of rules, policies, and procedures during confinement.  (DN 173-11, PageID.1717).  Plaintiff was transferred from HCDC on December 15, 2022.  (DN 172-3, PageID.1656).

## III.    LEGAL STANDARD

Before the Court may grant a motion for summary judgment, it must find that there is "no genuine dispute as to any material fact" and that the moving party is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

Assuming the moving party satisfies its burden of production, the nonmovant "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that

reveal a genuine issue for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Celotex*, 477 U.S. at 324). The non-moving party's evidence is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in favor of the party opposing summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The fact that a plaintiff is *pro se* does not lessen his or her obligations under Rule 56. "The liberal treatment of *pro se* pleadings does not require the lenient treatment of substantive law, and the liberal standards that apply at the pleading stage do not apply after a case has progressed to the summary judgment stage." *Johnson v. Stewart*, No. 08-1521, 2010 WL 8738105, at *3 (6th Cir. May 5, 2010) (citations omitted). However, statements in a verified complaint that are based on personal knowledge may function as the equivalent of affidavit statements for purposes of summary judgment. *Weberg v. Franks*, 229 F.3d 514, 526 n.13 (6th Cir. 2000); *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992); *see also Carr v. Metro Gov't*, No. 3:19-CV-P449-CHB, 2022 WL 4686993, at *3–4 (W.D. Ky. Sept. 30, 2022). Additionally, when video evidence is available, the facts must be viewed "in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007).

## IV.  DISCUSSION

### A.  Conditions of Confinement

While the Eighth Amendment provides a convicted prisoner the right to be free from cruel and unusual punishment, it is the Due Process Clause of the Fourteenth Amendment that provides the same protections to pretrial detainees. *Thomas v. Mayfield Police Dep't*, No. 5:21-CV-P97-TBR, 2021 WL 6135560, at *4 (W.D. Ky. Dec. 29, 2021) (citing *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018)). Thus, the Fourteenth Amendment applies to conditions

of confinement claims brought by pretrial detainees. *Bensfield v. Murray*, No. 4:21-CV-P104-JHM, 2022 WL 508902, at *2 (W.D. Ky. Feb. 18, 2022) (citing *Brawner v. Scott Cnty.*, 14 F.4th 585, 591 (6th Cir. 2021)). This standard has two prongs. To satisfy the first, or objective prong, a plaintiff must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Contemporary standards of decency determine whether conditions of confinement meet this standard. *See*, *e.g.*, *Hadix v. Johnson*, 367 F.3d 513, 525 (6th Cir. 2004) (citing *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)). Contemporary standards of decency are violated only by "extreme deprivations" which deprive the prisoner of the "minimal civilized measure of life's necessities." *Id.* (citing *Hudson v. McMillian*, 503 U.S. 1, 9, (1992)).[3] To satisfy the second prong under the Fourteenth Amendment, a plaintiff must show that defendants acted "deliberately" and "recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Brawner*, 14 F.4th at 596 (quoting *Farmer*, 511 U.S. at 836). Stated another way, "[a] pretrial detainee must prove 'more than negligence but less than subjective intent—something akin to reckless disregard.'" *Id.* at 596–97 (quoting *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (*en banc*)).

Plaintiff challenges the conditions of his confinement at HCDC as unconstitutional because, due to overcrowding, he was housed in a cell designed for ten inmates, but regularly held up to 15. Additionally, he argues that he was deprived of adequate recreation and exercise. (DN 192-1, PageID.1908-22). Defendants seek summary judgment on Plaintiff's conditions of

---

[3] The objective prong for Eighth and Fourteenth Amendment conditions of confinement claims is the same. *See Mitchell v. Phillips*, No. 5:24-CV-P53-JHM, 2024 WL 4729313, at *2 (W.D. Ky. Nov. 8, 2024). As such, the Court will cite to case law applying the Eighth Amendment objective standard where instructive.

confinement claim, arguing that Plaintiff has not established a deprivation of basic necessities such to give rise to a constitutional infirmity. (DN 173-1, PageID.1690-94).

As explained by the Sixth Circuit, "overcrowding is not, in itself, a constitutional violation," unless it results "in an unconstitutional denial of such basic needs as food, shelter, or sanitation." *Agramonte v. Shartle*, 491 F. App'x 557, 560 (6th Cir. 2012) (citing *Wilson v. Seiter*, 501 U.S. 294, 298, (1991); *Rhodes*, 452 U.S. at 345–48). Thus, only "extreme deprivations" can "support a prison-overcrowding claim." *Agramonte*, 491 F. App'x at 560 (internal quotation marks omitted).

Plaintiff argues that the crowded conditions resulted in greater violence and hostility, citing altercations between himself and other inmates. (DN 192-1, PageID.1912-13). Plaintiff, however, fails to "produce evidence establishing that [overcrowding] *itself* caused greater violence." *Rhodes*, 452 U.S. at 343 (emphasis added). Nor does he produce evidence that would establish a disproportionate increase in inmate violence. *See Rouse v. Caruso*, No. 06-CV-10961-DT, 2011 WL 918327, at *22 (E.D. Mich. Feb. 18, 2011), *report and recommendation adopted*, No. 06-CV-10961, 2011 WL 893216 (E.D. Mich. Mar. 14, 2011) (granting summary judgment where plaintiffs produced "no evidence . . . of a causal connection between the crowded conditions and the incidents of violence," nor presented "any evidence regarding the frequency of fights over time as the occupancy of the prison has increased."); *see also Rhode*s, 452 U.S. at 343 (evidence of increased violence in proportion to the increase in population itself refuted a claim of cruel and unusual punishment). On this record, a reasonable juror could not conclude that the overcrowding at HCDC contributed to a substantial risk of excessive inmate-on-inmate violence.

Plaintiff also argues that the lack of basketball facilities and other equipment, combined with an average recreation frequency of every 3.6 days[4] constitute "extreme limitations on recreation" sufficient to rise to the level of a constitutional violation.  (DN 192-1, PageID.1919-20).

The Sixth Circuit has held that "[i]t is generally recognized that a total or near-total deprivation of exercise or recreational opportunity, without penological justification, violates Eighth Amendment guarantees.  Inmates require regular exercise to maintain reasonable good physical and psychological health."  *Patterson v. Mintzes*, 717 F.2d. 284, 289 (6th Cir. 1983). The Sixth Circuit has not established a constitutional minimum amount of recreation for prisoners. *See Rodgers v. Jabe*, 43 F.3d 1082, 1086 (6th Cir. 1995).

Defendants produce Plaintiff's recreation logs from HCDC.  (DN 173-12; DN 173-13). The logs reflect that Plaintiff was allowed outdoor recreation 69 times in 27 weeks, or approximately 2.7 times per week.  (DN 173-13).  The logs additionally document that Plaintiff refused to participate in recreation on at least 15 occasions.  (*Id.*).

Plaintiff does not dispute the contents of the recreation logs or that he refused recreation time.  (DN 192-1, PageID.1919).  Plaintiff instead argues that the lack of equipment, crowded gym, and frequency of recreation time constructively renders recreation at HCDC "non-existent." (*Id.*).  Yet these conditions are not extreme deprivations sufficient to implicate the Eighth or Fourteenth Amendments.  *See*, *e.g.*, *Lyle v. Tenn. Dep't of Corr.*, No. 3:16-CV-01441, 2016 WL 3460256, at *2 (M.D. Tenn. June 24, 2016) (allegation that jail did not provide exercise programs or equipment failed to state a claim where plaintiff acknowledged "some opportunity" to engage in recreation and alleged no adverse effects due to limitations); *Middlebrook v. Tenn.*

---

[4] Plaintiff's computation of average recreation stems from his allegations in the complaint, which assert that he was permitted recreation time 14 times in 51 days.  (DN 78, PageID.535).

*Dep't of Corr.*, No. 07-2373, 2010 WL 3432687, at *11 (W.D. Tenn. Aug. 31, 2010) (allegation of inadequate recreation space and equipment did not state a claim under the Eighth Amendment); *see generally*, *Brown v. Kelly*, No. 4:12 CV 1356, 2012 WL 5877424, at *3 (N.D. Ohio Nov. 20, 2012) ("Occasional deprivation of recreation for a limited time is insufficient to suggest the type of extreme deprivations which are necessary" for a conditions of confinement claim).

On this record and drawing all reasonable inferences in his favor, while Plaintiff may be able to establish that recreation was limited at HCDC, he does not show that he was denied an opportunity for recreation or deprived of recreation entirely.  Moreover, Plaintiff acknowledges that he refused recreation on multiple occasions when it was offered.  *See Hayden v. Combest*, 72 F.3d 129 (6th Cir. 1995) (affirming grant of summary judgment where record reflected that the plaintiff had opportunities to exercise and that he had even refused recreation on some occasions). Finally, Plaintiff does not establish that the limited access caused him physical injury or any other harm.  *See Hughes v. Bedford Cnty.*, No. 4:18-CV-75, 2020 WL 980143, at *4 (E.D. Tenn. Feb. 28, 2020) (granting summary judgment where the plaintiff was offered constitutionally adequate recreational time and did not demonstrate any physical or mental injury as a result of allegedly insufficient recreation time).  For these reasons, Plaintiff's claim asserting limited recreation opportunities at HCDC fails to satisfy the objective prong of the *Brawner* standard, and as such does not present a Fourteenth Amendment violation.

Accordingly, the Court finds that Defendants are entitled to summary judgment on Plaintiff's conditions of confinement claims.

### B.  Excessive Force

Since Plaintiff was a pretrial detainee at the time he commenced this action, "the Fourteenth Amendment's more generally applicable Due Process Clause governs to bar a government

official's excessive use of force." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013). The Supreme Court clarified the Fourteenth Amendment standard for excessive force claims in *Kingsley v. Hendrickson*. 576 U.S. 389 (2015). *Kingsley* established "a two-prong inquiry for Fourteenth Amendment excessive-force claims." *Hale v. Boyle Cnty.*, No. 20-6195, 2021 WL 5370783, at *4 (6th Cir. 2021). First, "an official must purposefully, knowingly, or ('possibly') recklessly engage in the alleged physical contact with the detained person . . . . Mere negligent or accident will not suffice." *Id.* (citing *Kingsley*, 576 U.S. 396–97 (internal citations omitted)). Second, "the official's use of force must be objectively unreasonable." *Id.* Courts consider the following factors in assessing the "reasonableness or unreasonableness of the force used":

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Kingsley*, 576 U.S. 397.

Plaintiff alleges an unconstitutional use of force by Brickner and Jay while transporting him to a suicide watch cell. Specifically, he claims that Brickner and Jay placed him in a chokehold twice, once while he was handcuffed, despite "not [being] hostile, nor . . . a threat to [himself] or staff." (DN 192-1, PageID.1899). He further alleges that Jay "maced" him "without warning." (*Id.*). Plaintiff states that he saw medical for his injuries as the result of the use of force against him. (*Id.*).

Defendants seek summary judgment on the basis that the use of force by Brickner and Jay was objectively reasonable under the *Kingsley* factors set forth above. (DN 173-1, PageID.1694-97).

Plaintiff relies primarily on the video surveillance footage from November 15, 2022.[5] The six-minute surveillance video shows the following acts.[6] Plaintiff, who was handcuffed, entered the suicide watch cell escorted by two officers. Plaintiff appeared to strike his head against the wall.[7] The officers, presumably Brickner and Jay, backed Plaintiff away from the wall, and Plaintiff appeared to begin resisting them. Two additional officers arrived to assist. Plaintiff, still handcuffed, was lowered to his knees while one officer, presumably Brickner, secured Plaintiff by the upper torso. Lying in prone position, Plaintiff was surrounded by three officers, while a fourth officer removed his handcuffs.

Once Plaintiff's handcuffs were removed, he was sat upright by officers and appeared to be conversing with them. One officer can be seen tugging on Plaintiff's pant leg. Plaintiff stood up while three officers approached him with a suicide smock, holding it up in a manner to cover him. The parties appeared to have a verbal exchange. Plaintiff did not disrobe. Approximately 45 seconds later Plaintiff moved aggressively (or erratically) behind the smock and appeared to grapple with the officers until he was lowered to the ground by force. Three officers held Plaintiff down while a fourth removed his uniform.

Plaintiff immediately sat up with the smock laying across him, while officers left a mattress/bedroll and exited the cell. Plaintiff did not put the smock on, but stood up, fully nude, appearing to call out to officers and raising his arms. Plaintiff walked towards the cell door and hit his head against it three times before pacing in his cell. Approximately ten seconds later, the

---

[5] The video entitled, "Cell 403 11-15-2022" captures the events pertaining to Plaintiff's claim of excessive force. (DN 204).

[6] The video does not contain audio. To the extent that there exists ambiguity in the video footage, the Court views "any relevant gaps or uncertainties left by the videos in the light most favorable to the Plaintiff." *Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017).

[7] Plaintiff alleged in his verified complaint that he "banged his head on the wall and was instructed to stop by being pushed against the wall. The Plaintiff was then forced to the ground as the Defendants attempted to take the restraints off the Plaintiff." (DN 78, PageID.453).

cell door opened with an officer's arm in view, and a one-second burst of spray was administered toward Plaintiff's face. Plaintiff then washed his face at the sink through the end of the video.

The Court now examines the first two use of force incidents under the lens of *Kingsley*. At the outset, there are certain germane inconsistencies between the surveillance footage and Plaintiff's version of events. First, the video shows there were wrist restraints on Plaintiff when the incident began until they were removed by officers. However, Plaintiff was subdued in order to effectuate the officers' removal of Plaintiff's handcuffs. This constitutes the first use of force incident alleged. Next, Plaintiff was not fully restrained when officers approached with the suicide smock. During this incident, multiple officers assisted in securing and disrobing Plaintiff, which seemingly required substantial effort by them to regain control over him, as he presented as volatile and/or confrontational. This constitutes the second use of force incident alleged.

While Plaintiff states that this video shows that he was "plac[ed] . . . in a tight chokehold,[8]" while "the other officers assist[ed] in taking the Plaintiff to the ground," (DN 192-1, PageID.1933-34), the video does not show that any officer had his hands around Plaintiff's neck or throat or secured him above the shoulders for any longer than a few seconds. Plaintiff was released once officers regained control over him during both physical force incidents. Thus, the video shows that the technique employed by Brickner and Jay was only used for a few seconds at a time while Plaintiff was resisting their efforts to remove his handcuffs and place the suicide smock on him.

As to the application of *Kingsley*, the record demonstrates that Brickner and Jay "purposefully, knowingly, or ('possibly') recklessly engage[d] in the alleged physical contact

---

[8] Plaintiff does not define the term chokehold nor explain how the technique employed by Brickner and Jay violated the precepts set forth in the HCDC Use of Force Policy, despite his assertion that the Policy is "direct evidence that the Defendants' actions were against HCDC policy and was excessive . . . ." (DN 192-1, PageID.1935; DN 192-10).

with" Plaintiff.  *Hale*, 2021 WL 5370783, at *4.  Accordingly, the Court focuses its inquiry on the second *Kingsley* prong—whether a reasonable factfinder could conclude the force used was "objectively unreasonable."  576 U.S. at 396–97.  "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight."  *Id*. at 397.

The video footage demonstrates that the force was applied by Brickner and Jay to regain control of Plaintiff, who was visibly uncooperative, in order to remove his wrist restraints and apply the suicide smock.  The relationship between the need for use of force and the amount used was therefore proportionate.  During both incidents, Brickner and Jay stopped applying force when Plaintiff became compliant, first with removing the handcuffs and then with removing his clothing, thus evincing an effort made to temper or limit amount of force.  Indeed, between Defendants' applications of force, the officers can be seen having a dialogue with Plaintiff, apparently affording Plaintiff the opportunity to comply with their requests prior to engaging in force.  These factors therefore weigh in favor of a finding of objective reasonableness.  *See Sears v. Bates*, No. 6:18-CV-234-REW, 2020 WL 5996419, at *9 (E.D. Ky. Oct. 9, 2020) (finding that officers used minimal and non-injurious force to maintain control of unruly inmate and observing that "[t]he mere fact that there was incidental throat contact does not convert Bates's otherwise *de minimis* use of force into unreasonable excessive force.").

Plaintiff claims he was treated for injuries to his eyes, head, throat/neck, back, and knee following the incident, citing to a medical note dated November 16, 2022.  (DN 192-1, PageID.1899, 1935; DN 173-14; DN 192-6, PageID.1946).   This document reveals that Plaintiff was seen by medical the day after the incident.  At that visit, he reported the use of force against him and complained of bilateral knee pain and sore throat.  Medical staff noted that his knees had

"[a]ctive and passive [range of motion] without grimace," and his throat revealed "no redness no drainage denies cough glands with no swelling." (DN 173-14). Plaintiff was prescribed Motrin and Claritin. (*Id*.). Here, the limited nature of Plaintiff's injuries weighs in favor of a finding of objective reasonableness. *See Graves v. Mays*, No. 18-1200-JDT-CGC, 2020 WL 6263864, at *4 (W.D. Tenn. Oct. 23, 2020) (evaluating *Kingsley* factors and dismissing pretrial detainee's excessive force claim where the plaintiff complained of a chipped tooth but had "no visible signs of injury" following use of force incident).

As to the severity of the security problem and the threat perceived by officers, the Court observes that Plaintiff was placed in isolation pursuant to a suicide watch order due to his refusal to take his seizure medication. Once transferred to the suicide watch cell, Plaintiff is seen hitting his head on the cell walls and door multiple times. As Plaintiff exhibited self-injurious behavior, this factor weighs in favor of a finding of objective reasonableness. *See Hedges v. Back*, No. 5:20-CV-509-JMH-HAI, 2021 WL 7083121, at *5 (E.D. Ky. Dec. 10, 2021), *report and recommendation adopted*, No. 5:20-CV-509-JMH-HAI, 2022 WL 507429 (E.D. Ky. Feb. 18, 2022) (finding no issue of material fact as to whether defendant-officers' use of taser and restraints was excessive where plaintiff-detainee threatened self-harm).

As to whether Plaintiff actively resisted the officers, the video demonstrates that Plaintiff appeared agitated and uncooperative with officers' attempts to remove his handcuffs. After his handcuffs were removed, Plaintiff did not change into his suicide smock despite ample opportunity to do so, and then resisted their efforts to assist in removing his uniform. This element weighs in favor of a finding of objective reasonableness. *See Ayala-Rosales v. Teal*, No. 4:14-CV-48, 2015 WL 13029352, at *6 (E.D. Tenn. Oct. 20, 2015), *aff'd*, 659 F. App'x 316 (6th Cir. 2016)

(summary judgment warranted on pretrial detainee excessive force claim where the plaintiff "refused to allow himself to be secured in a holding cell.").

While Plaintiff asserts that he was "not physically resisting, nor was he a threat to himself or the officers," and "never verbally or physically refused" to disrobe, the video demonstrates otherwise.  (DN 192-1, PageID.1933).  Contrary to Plaintiff's assertion, the video footage is not dispositive of his claim that Brickner and Jay were objectively unreasonable in their use of force.  The video demonstrates that Plaintiff was, at a minimum, uncooperative and erratic with the officers, did not put on his suicide smock as instructed, and engaged in self-harm and disorderly behavior by repeatedly hitting his head against the cell walls and doors.  For these reasons, a reasonable jury could not deem the officers' uses of force objectively unreasonable.

The Court next turns to Plaintiff's claim that Jay pepper sprayed him "without warning." (DN 192-1, PageID.1899).  As described above, the surveillance video is consistent with Jay's incident report dated November 15, 2022, and his affidavit, which state that Plaintiff was administered a one-second shot of pepper spray after he hit his head against the cell door. (DN 173-6; DN 173-8).  Likewise, Jay's affidavit states that he administered a "one-second shot of pepper spray" in Plaintiff's direction after Plaintiff "slammed his head against the metal cell door and began kicking it." (DN 173-8).  "He did not [hit his head] any more after being sprayed." (*Id.*).  Jay attests that "[i]t is important that an inmate follow a jail official's order because refusal to do so undermines the discipline, security, and safety of the jail," and that disorderly behavior is discouraged "because such behavior can become contagious to the point that many inmates are loud, unruly, belligerent, and physical."  (*Id.*).

Plaintiff acknowledged that, prior to being sprayed, he hit his head on the cell door "out of frustration and anger," (DN 78, PageID.543), and confirms that the video shows that he "hit his

head on the cell door . . . and began walking in circles in the cell." (DN 192, PageID.1934-35). Plaintiff refutes that he hit his head against the cell door more than once and denies kicking it. (*Id.*). While belied by the video evidence, Plaintiff's version of events is nonetheless insufficient to give rise to a genuine dispute. *See Harbin v. Eaves*, No. 5:13-CV-149-GNS, 2015 WL 3687468, at *6 (W.D. Ky. June 12, 2015) (plaintiff's purported dispute was immaterial because even a "more severe version of events" did not amount to a constitutional violation based on excessive force).

Here, Plaintiff's recalcitrance—by striking the cell door with his head—put himself at risk of injury and created a disorderly situation prompting a response by officers. While Plaintiff may not have received notice that he was to be sprayed, it was not unprovoked as he suggests. Jay's one-second burst of pepper spray to prevent Plaintiff from continuing to engage in this behavior was proportionate. When Plaintiff stopped hitting his head, Jay did not spray a second time. Plaintiff has no discernable injury. Thus, applying *Kingsley* to the record before the Court, there is insufficient evidence from which a reasonable jury could find that Plaintiff's federal constitutional rights were violated by Jay's administration of pepper spray. *See Graves*, 2020 WL 6263864, at *5 (on summary judgment, officer's single shot of pepper spray was objectively reasonable and did not constitute excessive force where detainee kicked his cell door, refused to obey officers' commands, and had previously attempted to harm himself); *see also Sears*, 2020 WL 5996419, at *8 (single shot of pepper spray on pretrial detainee was objectively reasonable under *Kingsley* where detainee repeatedly disobeyed orders).

The Court concludes that the acts depicted during Plaintiff's transfer into and after he was placed in the suicide watch cell do not give rise to a genuine dispute as to whether Brickner and Jay applied objectively unreasonable force in violation of his Fourteenth Amendment rights. Accordingly, they are entitled to summary judgment on this claim.

### C.  Failure to Intervene/Protect

In the context of a pretrial detainee's failure to protect claim, "an officer violates the Fourteenth Amendment when (1) he acts intentionally 'with respect to the conditions under which the plaintiff was confined,' (2) those conditions 'put the plaintiff at substantial risk' of harm, (3) he does not take reasonable steps to abate that risk, and (4) by failing to do so he actually causes the plaintiff's injuries." *Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 945 (6th Cir. 2022) (quoting *Westmoreland v. Butler Cnty., Ky.*, 29 F.4th 721, 729 (6th Cir. 2022)).

As Plaintiff fails to establish excessive force by Brickner and Jay in violation of the Fourteenth Amendment, his derivative claim alleging Payne's failure to intervene or protect him during the use of force incidents (DN 192-1, PageID,1936), must necessarily fail. *See Blair v. Ky. State Penitentiary*, No. 5:21-CV-P75-JHM, 2023 WL 5281941, at *6 (W.D. Ky. Aug. 16, 2023) ("Having determined that no excessive force was used, Plaintiff's failure-to-intervene claim fails as a matter of law.").

Accordingly, Defendants are entitled to summary judgment on Plaintiff's failure to intervene claim as well.

### D.  Due Process

"The Fourteenth Amendment's Due Process Clause constrains governmental decisions that deprive individuals of certain protected interests." *Finley v. Huss*, 102 F.4th 789, 812 (6th Cir. 2024) (citing *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)).  "A procedural due process claim involves two steps.  The plaintiff must first demonstrate the presence of a constitutionally protected 'property' or 'liberty' interest.  Then, the plaintiff must show that a state

actor deprived him of that interest without affording him constitutionally sufficient process." *Finley*, 102 F.4th at 812 (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 459–60 (1989)).

In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Supreme Court set forth the standard for determining when a state-created right creates a federally cognizable liberty interest protected by the Due Process Clause. Under *Sandin*, a prisoner is entitled to the protections of due process only when the sanction "will inevitably affect the duration of his sentence" or when a deprivation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 486–87; *see also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790–91 (6th Cir. 1995).

Plaintiff appears to assert a due process violation based upon his transfer to another isolation cell pursuant to a suicide watch order. (DN 192-1, PageID.1922). He states that, due to "exercising [his] right to not take medications that are not court ordered, [he] was forced to be placed on suicide watch." (DN 192-1, PageID.1899). Defendants seek summary judgment on the basis that Plaintiff fails to establish an atypical and significant hardship under *Sandin, supra*, stemming from the conditions of his placement on suicide watch. (DN 173-1, PageID.1699).

Plaintiff argues that, as a result of "exercising [his] right to not take medications that are not court ordered, [he] was forced to be placed on suicide watch." (DN 192-1, PageID.1898-99). The Court agrees with Defendants that Plaintiff does not allege, nor raise a genuine dispute about the conditions of his suicide watch such to establish an "atypical and significant hardship" in relation to the normal incidents of life in pretrial detention. *Sandin*, 515 U.S. at 486–87.[9] It is

---

[9] The Court applies *Sandin* to analyze Plaintiff's procedural due process claim. *See Johnson v. Grayson Cnty., Ky. Det. Ctr.*, No. 21-5772, 2022 WL 3479501, at *2 (6th Cir. May 27, 2022) (acknowledging the absence of Sixth Circuit precedent deciding whether *Sandin*'s atypical and significant hardship standard governs procedural due process claims brought by pretrial detainees); *see also Lyons v. Barry Cnty. Jail*, No. 1:24-CV-1162, 2025 WL 262142, at *8 (W.D. Mich. Jan. 22, 2025) ("There is some question as to whether *Sandin* provides the proper measure for changes in the conditions of confinement for pretrial detainees. . . . Arguably, *Sandin*'s hardship test is flexible enough to address the conditions of confinement for pretrial detainees."); *cf. Dilworth v. Adams*, 841 F.3d 246, 252

undisputed that Plaintiff refused to take his prescribed seizure medication and was placed on suicide watch by medical and jail staff. (DN 192-1, PageID.1898). Consequently Plaintiff, who was previously housed in isolation pursuant to a separate order, was moved to a different isolation cell for suicide watch observation for approximately ten days. (DN 173-6; DN 173-12; DN 192-4). Because Plaintiff challenges only the fact of his placement on suicide watch, he fails to establish an atypical or significant hardship in relation to the normal incidents of life in pretrial detention. *See McGrew v. Boyd Cnty.*, No. 13-CV-30-HRW, 2013 WL 5234332, at *3 (E.D. Ky. Sept. 17, 2013) (dismissing for failure to state a claim where inmate did not allege an atypical or significant hardship from placement in suicide cell and facts indicated that such placement was warranted). Indeed, courts in this Circuit have held that mere placement on suicide watch, standing alone, does not state a constitutional violation. *See*, *e.g.*, *Jones v. Lee*, No. 2:09-CV-11283, 2012 WL 683362, at *4 (E.D. Mich. Mar. 2, 2012), *report and recommendation adopted*, No. 09-11283, 2012 WL 1048541 (E.D. Mich. Mar. 28, 2012) (finding that "[t]emporary placement on suicide watch, even when not necessary, does not implicate a liberty interest protected by the Due Process Clause," and observing that "there is no constitutional right to avoid being placed on suicide watch.") (internal quotation marks omitted; collecting cases); *Jones v. Blackburn*, No. 3:14-CV-01229, 2014 WL 2480601, at *7 (M.D. Tenn. June 2, 2014) ("because there is no liberty interest in assignment to any particular prison, or housing unit within a prison, the plaintiff has no due-process claim for being placed on suicide watch or

---

(4th Cir. 2016) (applying *Bell v. Wolfish*, 441 U.S. 520 (1979) to pretrial detainee due process claims). However, the Court notes that Plaintiff's claim would fail regardless of the standard employed. The undisputed record shows that his placement on suicide watch was determined by medical and jail staff upon his refusal to take his prescribed seizure medication. As such, the placement was legitimate and non-punitive. *See Bell*, 441 U.S. at 539; *Martucci v. Johnson*, 944 F.2d 291, 294 (6th Cir. 1991) (detainee's eight-day segregation was reasonably related to legitimate governmental objective, did not amount to punishment, and did not violate principles of due process); *see also Lyons*, 2025 WL 262142, at *9 (W.D. Mich. Jan. 22, 2025) (detainee's claimed deprivation of "out of cell programming" failed to state a claim under either *Sandin* or *Dilworth*).

precautionary watch."). Plaintiff's claim arising from his placement on suicide watch must therefore fail.

Accordingly, the Court finds that Defendants are entitled to summary judgment on Plaintiff's due process claim.

### V.    CONCLUSION

For the reasons set forth above, and the Court being otherwise sufficiently advised, **IT IS ORDERED** that Defendants' motion for summary judgment (DN 173) is **GRANTED**. All federal claims against Defendants are dismissed with prejudice. The Court will enter a Judgment consistent with this Memorandum Opinion and Order.

Date:    March 25, 2025

Joseph H. McKinley Jr., Senior Judge
United States District Court

cc:    Plaintiff, *pro se*
       Counsel of record
4414.015